**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 1, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

WILLIAM RAY JOHNSON,

Defendant - Appellee.

No. 04-6303

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 04-CR-98-HE)**

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (Robert C. McCampbell, United States Attorney, and Edward J. Kumiega, Assistant United States Attorney, Western District of Oklahoma, Oklahoma City, Oklahoma, with him on the briefs) for Plaintiff - Appellant.

Paul Antonio Lacy, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant - Appellee.

Before **TACHA,** Chief Circuit Judge,  **ANDERSON** , and **O'BRIEN** , Circuit Judges.

**ANDERSON** , Circuit Judge.

The government appeals on an interlocutory basis the district court's suppression of evidence seized pursuant to a warrantless administrative search of an auto salvage yard. We reverse and remand.

**BACKGROUND**

On April 16, 2004, Oklahoma City Police Department officers parked a "bait truck" with keys in its ignition on a street corner in Oklahoma City. The bait truck contained a concealed audio and video recording system and a global positioning system tracking unit. The officers noticed defendant William Ray Johnson, driving a wrecker, stop across the street from the bait truck, get out of his vehicle and stare at the truck. Subsequently, in the early morning hours of April 19, 2004, police monitoring the bait truck noticed that it was moving. Police officers approached the bait truck and arrested Johnson after he had driven the truck approximately ten blocks. The audio and video monitoring equipment revealed that Johnson had spoken to someone on his cell phone as soon as he started driving the truck, reporting that he was in the truck and moving it.

While Johnson was being booked on theft charges at the police station, police discovered that he had two prior felony convictions for burglary. They also discovered that he was employed by the Autoplex Drive-In Salvage Company ("Autoplex Salvage"), which was located approximately a block away from where

the bait truck was initially parked. Detective Scott Smith of the Oklahoma City Police Department's auto theft unit testified that he and other officers decided to perform an administrative warrantless search of Autoplex Salvage because Johnson worked there. [1] Additionally, Detective Mark Wood of the police department's criminal intelligence unit informed Detective Smith that Johnson was a member of the Rogue motorcycle gang, which was under criminal investigation, that Autoplex Salvage was a hangout for gang members, and that the officers should be careful when conducting their inspection. Detective Smith testified that he already knew that Johnson was a member of the Rogue motorcycle gang prior to being so informed by Wood.

At approximately 9:00 a.m. on April 20, 2004, nine Oklahoma City police officers and detectives from the auto theft unit, accompanied by Detective Wood, arrived at Autoplex Salvage to conduct the search. The officers did not have a warrant, but instead relied upon two Oklahoma statutes permitting warrantless administrative searches of salvage yards, Okla. Stat. tit. 47, § 591.6 and Okla. Stat. tit. 47, § 4-111. [2]

---

[1] Detective Smith stated he and another detective "decided we wanted to inspect the shop under Title 47 simply because the shop obviously had employed one car thief, and we wanted to see if there were similar goings on in the business." Appellant's App. at 125.

[2] Okla. Stat. tit. 47, § 591.6 provides:

(continued...)

-3-

When the officers arrived at the salvage yard, auto theft unit Detective Richard Spanbauer spoke to Guy McBride, the owner of Autoplex Salvage. Detective Spanbauer explained why they were there and showed McBride a copy of one of the authorizing statutes, Okla. Stat. tit. 47, § 4-111. McBride told the detective that he could "search anything of mine that he wants to but stuff that's not mine I can't give him permission [to search]." Appellant's App. at 67. As the inspection commenced, a wrecker towing a flat-bed trailer with a truck aboard began to drive off the salvage yard premises. Detective Scott Wilson stopped the

---

[2](...continued)
Every automotive dismantler and parts recycler shall keep a register of all purchases and sales of motor vehicles for three (3) years from the date of purchase or sale, showing the make, model, year, style, vehicle identification number, and name and address of the purchaser or seller of the motor vehicle. Such registers shall be made available for inspection by properly identified employees or agents of the Oklahoma Used Motor Vehicle and Parts Commission or identified law enforcement officers of the state, county and municipality where the business of the automotive dismantler and parts recycler is located, during reasonable business hours on business days. The inspection authority shall include the right to inspect any motor vehicle or parts thereof owned by or stored at the automotive dismantler and parts recycler's place of business.

Okla. Stat. tit. 47, § 4-111 authorizes:

Any peace officer of the state [to] inspect any vehicle of a type required to be registered hereunder in any public garage or repair shop or in any place where such vehicles are held for sale or wrecking, for the purpose of locating stolen vehicles and investigating the title and registration thereof.

wrecker and determined that the truck had been reported stolen. The driver of the wrecker, Kevin McBride, the nephew of Autoplex Salvage owner Guy McBride, was arrested.

Officers began inspecting vehicles in the salvage yard to determine whether any had altered Vehicle Identification Number ("VIN") plates and whether any vehicles or parts with identified VINs had been reported stolen. [3] Detective Smith testified that:

> [An inspection] takes a lot of people and it takes several hours due to the fact that each vehicle you have to inspect the public VIN. If the public VIN appears to be attached by the factory you just write down the VIN number so it can be checked to be stolen. If it appears that it's not been factory installed, for instance the VIN has been switched or not properly attached where it might not be the VIN that goes on that vehicle, then you have to further inspect the vehicle by looking for confidential VIN numbers to confirm if that's really the VIN number that belongs on the vehicle or if in fact that's a bogus VIN number or VIN number off another vehicle that's been placed on there as a public VIN.
>
> You also have to inspect engines and transmissions because they have numbers on them that correspond to the VIN number, so that if you find an engine laying there or transmission laying there you get the number off it, you can run it and build a full VIN for the purpose of identifying if it came out of a stolen vehicle, et cetera.

---

[3]A VIN is a unique number assigned to each vehicle and some of its component parts during the manufacturing process. VIN numbers are stamped on VIN plates, strips of metal approximately 3" by ½". A VIN plate is attached to the dashboard of each vehicle, and the same VIN number is stamped on major parts of the vehicle. VIN stickers are also typically attached to various places throughout the vehicle.

You also check any parts of the vehicles that would have mylar stickers, which are small stickers that have VIN numbers in full, which depending on how new the vehicle is could be fenders, it could be hoods, it could be glove boxes, it could be any number of areas on the vehicle.

Id. at 127-28.

After the officers searched all the vehicles in the salvage yard, they began to inspect the garage, which was also on the salvage yard premises. [4] Officers opened toolboxes, drawers and any other places that could contain a detached VIN plate. They did not search the used car lot or the showroom area. They also did not examine any of the paperwork pertaining to vehicles at the salvage yard. Detective Smith testified that:

[t]he only time I would ask to see a document if I did an inspection would be if I found a vehicle on the yard that something was wrong with. If I found a vehicle, for instance, that had no public VIN, which occasionally in salvage yards you'll find one, then I would ask them to produce the paperwork as to how they got the vehicle, who they got the vehicle from, et cetera, and any proof they might have as to if the VIN number was removed at the time it came into their lot, or if for some reason it was removed at the time it was at their lot.

Id. at 130-31.

---

[4]Autoplex Salvage's owner, McBride, testified that he operates three businesses on the same premises: the salvage yard, a used car business and a garage. There is no demarcation between the salvage yard and the garage. Johnson was the shop foreman for the garage business. One of his functions was to make sure that the other mechanics had the parts they needed to work on vehicles. On occasion, a used part from the salvage yard would be given to a mechanic in the garage for installation on a vehicle.

When the officers reached Johnson's workstation, they found two motorcycle frames, one of which had an obviously obliterated VIN that had been replaced by another stamped number. [5] The other motorcycle frame did not have a VIN, but McBride testified that he told Detective Smith that a VIN was not required on that frame because it was an aftermarket frame sold as a separate part. The officers seized both frames, although they later returned the one with no VIN. Next to the frames was a locked toolbox, which was identified as belonging to Johnson.

Johnson, who had not been at the salvage yard as the search commenced, arrived at the yard around 11:00 a.m. and identified his toolbox. Detective Smith testified as follows concerning his conversation with Johnson:

> I asked him if it was his toolbox, and he said it was. I then said give me the key to the toolbox. He initially said I lost it. It's been lost for a long time. And I said, well, Bill, you're a mechanic, and these are your tools. If your toolbox key has been lost for a long time how are you doing any work? And he looked down at the ground and he said, well, it's at home. He goes, I'll go get it. I said, why don't you just call somebody to bring it down to you. He goes, well, I'll see.
>
> I stayed out there looking at the frames. He walked towards the office area. I don't know exactly where he went in the front. I call it the office area. Where the front service desk area is. Approximately maybe five minutes later Mr. Johnson walked back

---

[5]Detective Smith testified that "[t]he VIN number was ground off and you can see welds had been ran over it and then it had been ground again." Appellant's App. at 143. He further testified that this is done to make it impossible to detect the original VIN.

and handed me a key. And he goes, here's a key. I didn't know that there was a key here.

Id. at 146-47. Johnson testified that Detective Smith told him "they were going to take my toolbox downtown unless I come up with a key to open it." Id. at 193. He further testified that he did not believe he had any option to deny Detective Smith access to his toolbox, based upon "the way Detective Smith phrased his statement. They were going to take my toolbox unless it was opened." Id. He further testified on cross-examination that "[a]t this point [he] didn't feel like [he] was] under arrest" and he agreed that he "could have walked away." Id. at 198. But he then testified that he felt "coerced" to give Smith the key "[w]hen [Smith] threatened to take [his] toolbox from the premises." Id. at 199.

Smith testified that his purpose in looking inside Johnson's toolbox was to determine whether it contained a license plate, VIN plate, or other means of identifying who owned the motorcycle frame with the obliterated VIN. [6] Smith found a motorcycle license plate in the toolbox, and he had another officer run a computer check to see if it was from a reported stolen motorcycle. It "checked

---

[6]Detective Smith testified that he "was hoping [he] would find either a tag or something in the toolbox that would help me specifically try to identify that motorcycle and possibly [the other] one, because the [other one] at the time, we couldn't tell if it had been ground or not because it was a thick coat of like paint and primer over it. So we were going to have to take it back to the shop, get the paint and primer off and then use acid and attempt to see if we could raise number, the previous number. It ended up there was no previous number on it, and then it was returned to Mr. McBride." Appellant's App. at 145.

clear." Id. at 148. Smith also found a blue box inside the toolbox, and in the blue box he found a loaded .22 revolver and some ammunition. Detective Wood then summoned an agent from the Bureau of Alcohol, Tobacco and Firearms ("ATF") to the scene and Johnson was arrested. Police obtained a warrant to search his house, where additional ammunition was found.

Johnson was subsequently indicted on two counts: being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and being a felon in possession of ammunition while under conditions of release, in violation of 18 U.S.C. §§ 922(g)(1) and 3147. Johnson moved to suppress the gun and ammunition. The government argued the seizure was accomplished pursuant to a valid warrantless administrative search under Oklahoma law, or, alternatively, that the officers had in good faith relied upon the constitutionality of the search pursuant to Oklahoma law. After noting that Johnson did not challenge the constitutionality of the Oklahoma statutes on which the officers relied for their search, the district court agreed with Johnson that the administrative inspection was "used as a pretext solely to gather evidence of criminal activity and was carried out as if the officers had unfettered discretion regarding its scope." Order at 4, Appellant's App. at 218. The court further stated:

> It is clear that the search in this case was motivated predominantly, if not exclusively, by the desire to conduct a criminal investigation. Although a desire to further a criminal investigation does not necessarily invalidate an otherwise proper administrative inspection,

-9-

such circumstances do, at the very least, warrant particular scrutiny of the inspection to assure that constitutional standards are met. . . . The officer in charge of the search testified that he felt comfortable searching any area or location large enough to hold a VIN plate. Obviously, that standard includes virtually anything, wherever located, and goes well beyond inspecting vehicles, parts or records. The Fourth Amendment forbids what occurred here—a warrantless general search under the guise of an administrative inspection.

Id. at 4-6, Appellant's App. at 218-20. With respect to the good-faith exception, the court ruled "the good faith exception to the exclusionary rule is not applicable. Given the predominant purpose of this inspection/search and the expansive scope of it, it was not objectively reasonable for an officer to assume the search was constitutional." Id. at 6 n.13, Appellant's App. at 220. The court also noted that "[t]he government did not argue that the defendant consented to the search of his toolbox nor did the evidence suggest any such consent." Id. at 3 n.7, Appellant's App. at 217.

The government appeals, arguing (1) "the officers could reasonably rely on a state-court decision, Horner v. State, 836 P.2d 679 (Okla. Cr. App. 1992), that upheld application of the instant inspection statute when police inspection of an automotive salvage business was motivated by suspicion developed during a criminal investigation that there might be stolen vehicles on the premises"; and (2) the scope of the inspection conducted was reasonable and constitutional. Appellant's Br. at 17.

**DISCUSSION**

In reviewing the grant of a motion to suppress, "we consider the evidence in a light most favorable to the district court's legal determinations, and review the court's findings of historical fact for clear error." United States v. Treto-Haro, 287 F.3d 1000, 1002 (10th Cir. 2002). "Whether the good faith exception to the exclusionary rule applies is a question of law that this court reviews *de novo*." United States v. Vanness, 342 F.3d 1093, 1097 (10th Cir. 2003).

## I. Scope of administrative search under §§ 591.6 and 4-111

Because an automobile salvage business is in a closely regulated industry, it may be subject to warrantless administrative searches, conducted pursuant to statute. See New York v. Burger, 482 U.S. 691, 707 (1987) ("[A]n operator of a junkyard engaging in vehicle dismantling has a reduced expectation of privacy in this 'closely regulated' business."); S & S Pawn Shop Inc. v. City of Del City, 947 F.2d 432, 436 (10th Cir. 1991); Horner v. State, 836 P.2d 679, 681 (Okla. Crim. App. 1992) ("[T]he nature of Oklahoma's regulatory statute indicates that the operation of an auto salvage yard is a 'closely regulated' business in Oklahoma.").

> In Burger, the Supreme Court established a three-part test for determining whether a warrantless inspection of a closely regulated industry violates the Fourth Amendment:

-11-

First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme. . . . Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.

United States v. Vasquez-Castillo, 258 F.3d 1207, 1210 (10th Cir. 2001) (quoting Burger, 482 U.S. at 702-03). To satisfy the "adequate substitute for a warrant" requirement, "a regulation must sufficiently inform the commercial property owner that his property will be subject to periodic inspections undertaken for specific purposes, must notify owners as to who is authorized to conduct an inspection, and must limit the discretion of inspectors in time, place, and scope." Id. at 1211.

In Illinois v. Krull, 480 U.S. 340 (1987), the Supreme Court extended the good-faith exception of United States v. Leon, 468 U.S. 897 (1984), to officers executing a search warrant in reliance upon a statute authorizing administrative searches of closely regulated businesses, even if the statute is later declared unconstitutional. The test is objective: the search is in good faith if the officer "relied, in objective good faith, on a statute that appeared legitimately to allow a warrantless administrative search of [defendant's business]." Krull, 480 U.S. at 360. An officer cannot "be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that

-12-

the statute was unconstitutional." Vanness, 342 F.3d at 1097 (internal quotation omitted).

Two decisions by the Oklahoma Court of Criminal Appeals have held that the statutes in question, Okla. Stat. tit. 47, § 591.6 and Okla. Stat. tit. 47, § 4-111, are constitutional and comport with the three-part test of Burger. See Horner v. State, 836 P.2d 679 (Okla. Crim. App. 1992) (upholding § 591.6); State v. Howerton, 46 P.3d 154 (Okla. Crim. App. 2002) (upholding Okla. Stat. tit. 63, § 4209.8, which is virtually identical to § 4-111 but applies to boats and related equipment). Johnson does not contest the constitutionality of the statutes. He argues, however, that the search actually conducted in this case exceeded what is permissible under those statutes.

We begin, therefore, by considering the general scope of the administrative search statutes in question. The Supreme Court in Burger noted that "[s]o long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself." Burger, 482 U.S. at 717. Thus, "an administrative scheme may have the same ultimate purpose as penal laws, even if its regulatory goals are narrower." Id. at 713. There can be little doubt, therefore, that an administrative search statute may serve a criminal law purpose as well as an administrative one. As the Oklahoma state court said, "because

-13-

automobile theft is indisputably a significant social problem in Oklahoma, we find that the State has a substantial interest in regulating the vehicle-dismantling and automobile salvage yard industry." Horner, 836 P.2d at 682. The administrative inspection scheme in §§ 591.6 and 4-111 is accordingly directed in part to the detection of stolen vehicles and vehicle parts. [7]

Our circuit has cautioned, however, that the evidence of criminal activity cannot be so compelling that police have, in essence, probable cause to believe that specific criminal conduct has occurred. Burger "did not endorse a scheme that would allow a warrantless search based on recently discovered evidence that criminal activity had occurred." S & S Pawn Shop Inc., 947 F.2d at 440. We further stated that "inspections of . . . business premises . . . conducted not as part of a pre-planned and dispassionate administrative procedure but instead

---

[7]Indeed, in Horner, in evaluating the constitutionality of the particular search conducted pursuant to § 591.6, the court noted that the search "was based upon a criminal investigation in Tulsa County. . . . [T]hey were going to the salvage yard to search for stolen vehicles and 'had information that those things might be there.'" Horner, 836 P.2d at 683 (Johnson, J., concurring and dissenting). The fact that police officers in Horner suspected some criminal activity of the kind the statute is designed to detect—presence of stolen vehicles—did not render the administrative basis for the search pretextual.

Furthermore, as the government points out, the state administrative scheme upheld in Burger likewise specifically contemplated searches undertaken to reveal criminal activity. The state's highest court held that the administrative inspection statute, N.Y. Veh. & Traf. Law § 415-a5, authorizes "searches undertaken solely to uncover evidence of criminality and not to enforce a comprehensive regulatory scheme." Burger, 482 U.S. at 698.

-14-

pursuant to direct criminal suspicion . . . give[] cause for grave constitutional concern." Id. at 441.

That is not the case here. Here, officers did not have "direct criminal suspicion" about Johnson or Autoplex Salvage. Rather, they knew Johnson had been arrested attempting to steal a truck a few nights earlier and they knew he worked at Autoplex Salvage. By their own admission, officers lacked probable cause to think that any specific criminal conduct had occurred. They had a vague suspicion that the kind of criminal activity the administrative scheme was directed towards detecting—car theft—had occurred or might be evident at the salvage yard where Johnson worked. There is nothing unconstitutional in embarking upon an administrative inspection with that degree of criminal suspicion. See United States v. Villamonte-Marquez, 462 U.S. 579, 584 n.3. (1983) (upholding administrative search of ship following an informant's tip that a vessel was carrying marijuana and noting that there was "little logic in sanctioning . . . examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers" (internal quotations omitted)); United States v. Thomas, 973 F.2d 1152, 1155-56 (5th Cir. 1992). We accordingly hold that the inspection, at least at its inception, did not go beyond what is permitted by the relevant statutes.

The next question is whether the officers' conduct in this case, in particular, their search of the locked toolbox, exceeded what is permitted by §§ 591.6 and 4-111. The statutes permit officers to examine "vehicles," vehicle "parts," and vehicle "parts . . . stored" at the salvage yard. VIN plates are "parts" of vehicles; nothing in the statutes obviously limits the officers to searching only for "major" or "large" parts of vehicles. While officers conducted a broad and detailed search of the entire premises,[8] the only item seized was the firearm found inside Johnson's toolbox. We accordingly turn to whether the officers properly searched inside that toolbox.

At the time officers reached Johnson's locked toolbox, they had the following information: Johnson had been arrested attempting to steal a truck a few days before. When officers commenced their administrative inspection of the salvage yard, another stolen vehicle was being driven off the premises by the owner's nephew. There was one, and possibly two, suspicious motorcycle frames very near Johnson's toolbox. The toolbox was large enough to contain license plates and VIN plates. Thus, the officers had at least a reasonable suspicion that the toolbox might contain something relevant to their administrative search. Furthermore, the fact that it was locked does not place it off limits from

_____

[8]This broad search was conducted after the owner of Autoplex Salvage, Guy McBride, gave the officers permission to search any areas belonging to McBride.

-16-

inspection.  See United States v. Biswell, 406 U.S. 311, 317 (1972) (holding that officers executing warrantless search under the authority of an administrative inspection statute were entitled to demand that gun dealer unlock storeroom). Officers accordingly did not exceed what is permissible under the administrative inspection statutes when they searched Johnson's toolbox.

## II.  Good-faith exception

Even were we to conclude that the statutes in question do not permit such a search, or to conclude that we cannot decide that question, [9] the good-faith exception to the exclusionary rule would apply and require us to reverse the district court's suppression of the evidence seized.  "Unless 'a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law.'"  Vanness, 342 F.3d at 1097 (quoting Krull, 480 U.S. at 349-50).  In this case, the statutes were not "clearly unconstitutional." Rather, they had been upheld as constitutional by the Oklahoma courts, including

---

[9]While the Oklahoma courts have generally upheld as constitutional §§ 591.6 and 4-111, they have not addressed their constitutionality in the particular circumstances of this case—i.e., as encompassing the search of a locked container on the premises of a closely regulated business.  Because federal courts do not have the "power to construe and narrow state laws," we ordinarily refrain from addressing such constitutional issues.  Grayned v. City of Rockford, 408 U.S. 104, 110 (1972); see Vanness, 342 F.3d at 1098.

in a context where officers suspected some criminal activity of the type the administrative inspection was designed to detect.

Further, while an officer cannot claim to have acted in good-faith reliance upon a statute "'if its provisions are such that a reasonable officer should have known that the statute was unconstitutional,'" id. (quoting Krull, 480 U.S. at 355), nothing in these statutes would have given rise to that suspicion. As indicated, the statutes permitted inspection of "parts" of vehicles, including "parts . . . stored" on the premises. Detective Smith testified that he had been involved in between six and ten similar inspections, and prior inspections were comparably thorough, including inspecting for VIN plates and numbers: "[i]f you inspect a large lot like Mr. McBride's, it takes a long amount of time to have to look at every VIN number, be sure the VIN number is attached properly. . . . You also have to inspect engines and transmissions . . . any parts of the vehicles that would have mylar stickers . . . ." Appellant's App. at 126-28. Additionally, the officers would have no reason to believe they could not demand to inspect inside a locked container which they reasonably believed to be subject to the search, particularly when they had developed additional suspicion concerning its possible contents. In sum, the officers relied in good faith on the administrative inspection statutes, as interpreted in Oklahoma cases, and on their objectively reasonable applicability to the inspection conducted at Autoplex Salvage.

### III. Pretext

Finally, we address Johnson's argument, with which the district court agreed, that the entire inspection was simply a pretext to seek evidence of criminal activity. We have previously acknowledged that an administrative inspection could be such a sham that it is "a pretext solely to gather evidence of criminal activity." United States v. Johnson, 994 F.2d 740, 742 (10th Cir. 1993). We have also characterized the issue of "[w]hether an administrative search is a pretext for a criminal investigation" as "a factual question." Id. at 743. While there certainly are factual issues involved in such an inquiry, we conclude that the district court in this case committed two legal errors in determining that the administrative search in this case was a pretext solely to gather evidence of criminal activity.

The first error was the court's implicit conclusion that an administrative inspection statutory scheme may never encompass a criminal law enforcement purpose. As we have explained, supra, an administrative inspection may encompass both an administrative and a criminal law enforcement purpose. Thus, the fact that the officers inspecting Autoplex Salvage had an objectively reasonable basis to suspect they might find stolen cars or car parts in their inspection does not invalidate that inspection. Second, we hold that the district court erred as a matter of law in summarily rejecting the officers' good-faith

-19-

reliance on the constitutionality of the statutes as applied to this search. In fact, the district court appears to have turned the good-faith analysis on its head when it rejected its applicability "[g]iven the predominant purpose of this inspection/search." Order at 6 n.13, Appellant's App. at 220. The district court appears to have focused on the subjective motivations of the officers, suggesting their desire to find something illegal about Johnson rendered the entire search unlawful. Where officers are engaged in a proper administrative search, the officers' motive is irrelevant; what matters is whether their conduct was objectively reasonable. See Whren v. United States, 517 U.S. 806, 813 (1996) (rejecting the idea that "an ulterior motive might serve to strip [officers] of their legal justification"). [10] We have held that it was.

_____

[10]Johnson itself is an example of a truly pretextual administrative search. In that case, federal authorities were suspicious that the defendant was involved in an illegal federal wildlife smuggling operation. A federal agent contacted a state agent and asked the state agent to accompany the federal agent to conduct an interview with the defendant. "After the state agent agreed to accompany the federal agent, the state agent decided to conduct a taxidermy inspection solely because the federal agent would be questioning [defendant]." Johnson, 994 F.2d at 743. We held it was established "as a matter of law that the federal agent used the state regulatory inspection as a pretext for an investigatory search." Id. at 743-44. In that case, it was clear that the administrative inspection was merely an afterthought designed to provide "cover" for the real, and impermissible, purpose for the search.

## CONCLUSION

For the foregoing reasons, we REVERSE the grant of Johnson's motion to suppress and we REMAND for further proceedings consistent herewith.