FILED
United States Court of Appeals
Tenth Circuit

**March 17, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

MARCOS SANCHEZ,

  Defendant - Appellant.

No. 06-2329

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-04-1685 JB)**

Laura Fashing, Assistant United States Attorney (Larry Gomez, United States Attorney) Albuquerque, New Mexico, for Plaintiff - Appellee.

Joseph Gandert, Assistant Federal Public Defender (Stephen P. McCue, Federal Public Defender, and Roger A. Finzel, Assistant Federal Public Defender, on the briefs) Albuquerque, New Mexico, for Defendant - Appellant.

Before **MURPHY, EBEL** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

The district court refused to suppress evidence against Marcos Sanchez. He

contends police officers did not have reasonable suspicion of criminal activity so

as to justify an investigatory stop of the vehicle in which he was riding. Further, he contends even if the stop was justified at its inception, the officers exceeded the scope of the stop by frisking him for weapons. We examine the use of statements and verbal acts of unidentified, but identifiable tipsters in contributing to the officers' suspicion of criminal activity. We also consider the circumstances which might justify a pat-down search incident to an investigatory stop. We affirm.

## I. BACKGROUND

At approximately 2:30 p.m. on July 25, 2004, Albuquerque Police Officers Jaramillo and Lopez were standing outside their respective patrol cars when they were flagged down by an unknown woman driving a white van. The woman was very excited and told them she had seen a man wearing a gray shirt striking a woman in the face at a nearby intersection. The woman provided no other details and the police did not question her further.[1]

The officers immediately drove toward the described intersection, approximately one block away. The officers did not see a man hitting a woman; they did, however, see a blue sedan and a white van pulling away quickly from a

---

[1] We do not fault the officers' choice to forgo extensive credibility checking in order to quickly respond. "[T]he business of policemen and firemen is to *act*, not speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) (emphasis added).

single-family home.  Officer Lopez, testifying at the suppression hearing, said "it appeared to me as if [the vehicles] were trying to get out of this quickly, you know, like they were in a little bit of a hurry to get out of there . . . ."  (R. Vol. III at 37.)  Officer Jaramillo likewise testified: "It just seemed like [the vehicles] were leaving the area . . . in a nonprudent manner. . . they were moving quickly." (*Id.* at 72.)

The officers also saw a number of individuals, later determined to be neighbors, pointing to the two vehicles as if to say "that's them."  (*Id.* at 8.) Officer Lopez testified "it didn't feel like a coincidence" that the neighbors were pointing at two vehicles located near the intersection right after the officers had been alerted to a potential assault and battery in that area.  (*Id.* at 31.)  He "felt [the pointing] had to do with this male beating up the female."  (*Id.*)

Officer Lopez stopped the van in the driveway and Officer Jaramillo stopped the sedan on the street, approximately ten yards away, out of concern the victim and/or suspect was in one of the vehicles.  Lopez asked the driver and sole occupant of the van, James Wicker, to step out of the vehicle.  Lopez asked Wicker if he was armed, to which Wicker responded he had a handgun in his front pocket.  Lopez handcuffed Wicker and removed a .25 caliber handgun (described as approximately two inches long).[2]  Lopez alerted Jaramillo to the presence of

---

[2]  Perhaps the barrel was two inches long.  In any event, the gun was small and easily concealable.

the gun.

At this point Officer Hinson arrived. Officers Jaramillo and Hinson ordered the three occupants out of the sedan and placed them in handcuffs. Because Wicker was armed, Jaramillo performed a pat down search of the three for officer safety reasons. Jaramillo located an empty gun holster in the waistband of the backseat passenger, later identified as Sanchez, who was wearing a gray shirt. Because Wicker had produced a concealed firearm, Jaramillo and Hinson asked the occupants of the sedan to remove their shoes in order to check for hidden weapons. Hinson located a small bag containing a white substance, later identified as methamphetamine, in the driver's shoe. After discovering the narcotics, Jaramillo asked the driver for consent to search the sedan. The driver gave oral and written consent to search.

The search revealed a .22 caliber pistol located underneath the driver's seat, but closer to the reach of a person in the backseat, where Sanchez had been sitting. Jaramillo testified the firearm fit perfectly into the holster found on Sanchez. After locating the gun, Jaramillo went to talk to the neighbors while Lopez and Hinson remained with the four individuals. While Jaramillo was speaking with the neighbors, Sanchez said, "Fucking neighbors!" (R. Vol. III at 15.) Lopez informed Sanchez the detention had nothing to do with the neighbors, but was based on a report of an assault from a passer-by. Sanchez said: "Yeah . . . I did get in an argument with my girlfriend. We had a verbal argument. There

was nothing physical, you know. I didn't hit her." (*Id.* at 15-16.) He added: "I have no reason to lie to you. I'm a convicted felon. I've done time. I'm retired." (*Id.* at 17.) Based on the discovery of the firearm and Sanchez's statement, Jaramillo arrested Sanchez for being a felon in possession of a firearm and transported him to the police station where records confirmed his felony status.

Sanchez was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He moved to suppress all evidence seized from the vehicle and all statements he made, contending the police lacked justification for the initial stop and exceeded the scope of the stop by frisking him for weapons. The court held a hearing at which Officers Jaramillo and Lopez testified. The court found their testimony to be credible and denied Sanchez's motion to suppress. Sanchez then pled guilty, reserving his right to appeal from the denial of his motion to suppress. He was sentenced to the mandatory minimum of 180 months imprisonment. He now challenges the denial of his motion to suppress.

## II. DISCUSSION

"When reviewing a district court decision on suppression of evidence, we must accept the court's findings of fact unless, viewing the evidence in the light most favorable to the court's findings, we conclude the findings were clearly erroneous. Evaluation of the credibility of witnesses, the weight to be given the evidence, and inferences to be drawn from the evidence are for the district court.

-5-

However, the ultimate determination of whether a search and seizure were reasonable under the Fourth Amendment is subject to de novo review." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).

A traffic stop is an investigatory detention which we analyze according to the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir. 1997). "*Terry* sets up a two-prong test of the reasonableness of investigatory detentions and weapons searches. First, we must decide whether the detention was justified at its inception. . . . Second, the officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place. At both stages, the reasonableness of the officer's suspicions is judged by an objective standard taking the totality of the circumstances and information available to the officers into account." *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004) (quotations and citations omitted).

A. Initial Justification for the Stop

"In order to conduct a lawful investigatory stop of a vehicle, the detaining officers must have, based on all the circumstances, 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Leos-Quijada*, 107 F.3d at 792 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The district court concluded the officers had reasonable suspicion of criminal activity based on the woman's tip, the pointing neighbors, and the

apparent urgency exhibited by the departing vehicles.[3]  Sanchez contends the officers lacked reasonable suspicion because the anonymous nature of the witnesses made their tips unreliable.

We first consider the woman's tip.  In *Johnson*, we identified two reasons "why anonymous tips trouble the courts and sometimes lead to the suppression of otherwise reliable evidence."  364 F.3d at 1190.  "The first concern relates to the motives of the tipster . . . .  This is why the Supreme Court . . . has required that anonymous tips be accompanied by corroboration and other indicia of reliability." *Id.* at 1190-91 (quotations and citation omitted).  "A second concern relates not to a tip's anonymity but to its level of specificity.  Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens."  *Id.* at 1191.  Here, these concerns are mitigated by the circumstances surrounding the tip.

The woman's motive was less suspect than the typical anonymous tipster because she was seeking help for a victim.  In *United States v. Brown*, we "consider[ed] it important that the caller's primary motive in contacting 911 . . . was not to implicate the armed man but to obtain aid and protection for his friend."  496 F.3d 2070, 1077 (10th Cir. 2007).  We noted the "call is more

_____

[3] Officers Lopez and Jaramillo had two distinct purposes for the stop – they were looking not only for a possible assailant (a man beating a woman), but also for a possible victim (the woman being beat).  While our analysis focuses on the assailant, the possible presence of the victim cannot be ignored.

-7-

analogous to a plea for help from a victim than to an informant's tip." *Id.; see also Adams v. Williams*, 407 U.S. 143, 147 (1972) (recognizing the greater weight carried by a witness's recent report, such as "when the victim of a street crime seeks immediate police aid and gives a description of the assailant").

Moreover, the woman reported the assault to the police in a face-to-face encounter, thus putting her anonymity at risk, at least to a limited degree, and allowing the police an opportunity to evaluate her credibility and demeanor. We stated in *Brown* that "a[n] unnamed individual who divulges enough distinguishing characteristics to limit his possible identity to only a handful of people may be nameless, but he is capable of being identified and thus is not anonymous." 496 F.3d at 1075. So it is with this woman tipster; she and/or her vehicle could have been identified by the police at the time she made her statement, as would have been obvious to her. Thus, her tip bears an indicium of reliability because she would have known she could be held liable for providing the police with false information. *See United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002) ("A reasonable person . . . would realize that in all likelihood the police could, if they so chose, determine the person's identity, and could hold him responsible if his allegations turned out to be fabricated."). That the police understandably did not take the time to obtain her personal information does not mean she was anonymous.

Many cases have recognized the difference between in-person informants

-8-

and anonymous calls. *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 276 (2000) (Kennedy, J., concurring) ("An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate police response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring."); *Davis v. United States*, 759 A.2d 665 (D.C. Cir. 2000) (police officer had probable cause for a search after citizen informant who declined to give his name flagged down the officer and told him a man nearby in a wheelchair was selling crack out of his right shoe); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster."); *United States v. Sierra-Hernandez*, 581 F.2d 760, 763 (9th Cir. 1978) ("[A]lthough the informant did not identify himself by name, he would have been available for further questioning if the agent had judged the procedure appropriate. Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly."); *United States v. Gorin*, 564 F.2d 159, 161 (4th Cir. 1977) ("[S]tandards of reliability should not prevent appropriate action when a victim of a crime immediately has contacted the police. That same analysis applies [when a witness informs the police in person about a crime].") (citation omitted).

As to the second concern – specificity – the woman's tip was not overly general. The woman described an aspect of the assailant's clothing (gray shirt).

Though she did not provide the age, race or any other physical characteristics of the victim or assailant, her tip was spatially specific. The officers knew they were looking for someone in a residential neighborhood only a block away. The tip did not provide the officers with excessive discretion to stop and search a large number of citizens – this was not a dragnet. The officers also knew the alleged assault occurred shortly before they were flagged down and could be continuing.[4]

Moreover, the woman's tip was not all the officers had to go on. After driving to the area described by the woman, the officers observed two vehicles departing quickly from a single-family home.[5] While quickly departing vehicles do not, in and of themselves, suggest criminal activity, it is a suspicious circumstance to be considered as part of the universe of facts. Here it becomes more significant when coupled with a number of people pointing at the vehicles as if to say "that's them."

---

[4] Police officers have certain leeway in the Fourth Amendment context "when they reasonably believe that a person . . . is in need of immediate aid." *United States v. Najar*, 451 F.3d 710, 714 (10th Cir. 2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). Among other things, we expect police officers to "aid individuals who are in danger of physical harm." *Id.* at 715 (quoting 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6 (4th ed.)).

[5] Sanchez contends "[t]he district court was wrong to interpret the officer's testimony as establishing that the vehicles were quickly leaving." (Appellant's Opening Br. at 24.) Both Officers Lopez and Jaramillo testified to the hasty departure. *Supra* at 3. In light of this testimony, the court's finding was not clearly erroneous.

We reject Sanchez's contention that the pointing neighbors were anonymous. Like the woman tipster, the neighbors divulged enough information about themselves to be capable of identification. They stood outside their houses throughout the duration of the stop and allowed themselves to be questioned by the officers. In addition to being readily identifiable by the police, they were known to the occupants of the two vehicles and exposed themselves to a risk of retaliation by their conduct. The neighbors were not anonymous and the concerns relating to anonymous tips – motive and specificity – are not present.

While each individual factor might not have been sufficient to establish reasonable suspicion of criminal activity, we don't parse the elements but consider the totality of the circumstances. *See Johnson*, 364 F.3d at 1189. In doing so, we "defer to the 'ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005) (quoting *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996)). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Indeed, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274; *see also Johnson*, 364 F.3d at 1194 ("[A]s long as [the officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity,

he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality.").

This case is easily distinguishable from *Florida v. J.L.*, where the Court concluded the police did not have reasonable suspicion to conduct a search based on an anonymous tip lacking sufficient indicia of reliability. 529 U.S. at 273-74. The Court noted "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271. Here, by contrast, we have much more. An identifiable woman reported an assault to the police in a face-to-face encounter. The officers knew the basis for her knowledge (direct observation) and were able to evaluate her credibility and demeanor. Moreover, her report was corroborated by identifiable (and later identified) neighbors pointing at two quickly departing vehicles. These factors distinguish this case from *J.L.* and, considered together, provide sufficient justification for the initial stop.

B. Scope of the Stop

"During an investigative detention, '[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo.'" *United States v. Garcia*, 459 F.3d 1059, 1063 (10th Cir. 2006) (quoting *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998)). The Supreme Court has recognized passengers may present a risk to officer safety equal to that

of the driver.  *See Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997).  Thus, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  *Id.* at 415.

"In some circumstances," an officer may go further and conduct a pat-down search for weapons.  *Garcia*, 459 F.3d at 1063.  "The purpose of the limited pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  *Id.* (quotations omitted); *see also United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) ("Officer safety is the primary objective justifying an officer's right to perform a pat-down search.").

An officer may conduct a pat-down search "if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous." *Garcia*, 459 F.3d at 1064 (quotations omitted); *see also Terry*, 392 U.S. at 27 (during an investigatory stop, an officer may perform a pat-down search "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime"). "The reasonable suspicion required to justify a pat-down search represents a minimum level of objective justification . . . . Reasonable suspicion is based on the totality of circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense."  *Rice*, 483 F.3d at 1083 (quotations and citations omitted).

Here, Officers Jaramillo and Hinson reasonably suspected the occupants of the sedan might be armed and dangerous based on the reported assault as well as the discovery of a concealed weapon on the driver of the van. They could reasonably have believed the occupants of the sedan were associated with the driver of the van. Jaramillo and Hinson were outnumbered by the three occupants of the sedan and had a valid concern for their safety. Their decision to conduct a limited pat-down search of the occupants was reasonable.

**AFFIRMED.**