FILED
United States Court of Appeals
Tenth Circuit

January 6, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

WILLIAM VINCENT CLARKSON,

        Defendant - Appellant.

No. 08-4054

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:06-CR-00734-DAK-1)**

---

Matthew Lewis (Maria Heckel with him on the briefs), Ray Quinney & Nebeker
P.C., Salt Lake City, Utah, for Defendant-Appellant.

Jeannette F. Swent, Assistant United States Attorney (Brett L. Tolman, United
States Attorney, with her on the brief), District of Utah, Salt Lake City, Utah, for
Plaintiff-Appellee.

---

Before **MURPHY**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

Defendant-Appellant William Clarkson was indicted for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). In a motion before the United States District Court for the District of Utah, Clarkson sought to suppress all evidence obtained in the search of the vehicle he was driving. The district court denied the motion to suppress, concluding: the police officer did not extend the traffic stop beyond its original purpose; even if the stop had been extended, the police officer had reasonable articulable suspicion Clarkson was engaging in criminal activity; and probable cause existed to search Clarkson's car because a narcotics dog indicated there were drugs inside the car and the police reasonably relied on the dog alert. The district court declined to decide whether the narcotics dog was qualified, concluding the dog's qualifications were irrelevant because the officers reasonably believed the dog was qualified.

This court exercises jurisdiction pursuant to 28 U.S.C. § 1291. Because the existence of probable cause under the circumstances of this case depends on the existence of an alert by a qualified narcotics dog, we **reverse** the decision of the district court and **remand** for proceedings consistent with this opinion.

## II. BACKGROUND

On September, 26, 2006, Officer Joseph Sutera of the South Salt Lake Police Department was monitoring a residence in Salt Lake City, Utah, due to suspected criminal conduct involving narcotics dealing, violent crime,

prostitution, and gang activity. Around 1:10 a.m., Officer Sutera observed a Cadillac parked in front of the residence. Officer Sutera ran a computer check on the Cadillac's license plate number, which indicated the vehicle lacked insurance and its registration had expired.

Officer Sutera then observed a man, later identified as Clarkson, leave the residence with a woman. The two individuals entered the Cadillac. Clarkson was the driver. Shortly thereafter, Officer Sutera stopped the car due to the registration and insurance violations. He asked Clarkson to place his hands outside of the window. Officer Sutera testified he did this because he was concerned about his safety "[d]ue to where the car had come from." Clarkson identified himself and explained to the officer he was picking up a friend and the car belonged to his mother. Officer Sutera testified he believed Clarkson's passenger was under the influence of narcotics because she was very fidgety, had trouble holding still, and her speech was slurred.

Officer Sutera questioned Clarkson regarding the car's expired registration and lack of insurance. Clarkson stated his mother knew he had the car, but did not want him to drive it with expired registration. During the conversation with the officer, Clarkson acknowledged he had put himself in a "poor position" by having been at the residence. Officer Sutera ran a computer check on Clarkson, which indicated he had a valid license and no outstanding warrants.

Approximately two minutes after Clarkson was pulled over, Officer Jim Anderson arrived at the scene with the K-9 patrol dog "Oso." Officer Anderson testified that upon arriving at the scene "I noticed the vehicle, an older style Cadillac, light in color, cream in color. Several days prior I had been the initial officer of a robbery in which a gentleman was beat up and pistol whipped with a handgun. They took his money, and that's the description of the vehicle that he gave." According to Officer Anderson, the robbery victim's description of the car was a "solid cream-colored vehicle."[1] The robbery suspects were two African-American men. Clarkson is also African-American. Officer Anderson stated "because [Mr. Clarkson's] vehicle was, you know, only a few blocks from the area, I felt like that might be the suspect vehicle." He felt concerned for his safety and told Officer Sutera a "vehicle similar in description" was used in an armed robbery a few nights earlier.

Officer Sutera testified that after this conversation with Officer Anderson, he was concerned about the possibility of weapons in the car. Upon re-approaching Clarkson's car, Officer Sutera asked Clarkson if he would get out of the Cadillac. He then asked Clarkson if he could check to verify that Clarkson did not have any weapons. Clarkson agreed. Officer Sutera performed a

---

[1]The record is unclear regarding the victim's description of the car involved in the robbery. Officer Anderson's police report described the car used in the robbery as "a white Montecarllo [sic] type vehicle" and "a white town car" and at one point during his testimony he stated the victim described the car as "an older style Cadillac."

pat-down of Clarkson and found no weapons. As Officer Sutera continued to question Clarkson, Officer Anderson had Oso sniff the Cadillac's exterior for the scent of narcotics. According to Officer Anderson, Oso alerted to the exterior of the front passenger-side door. At this point, Clarkson had been pulled over for slightly more than thirteen minutes. After Oso's alert, Officer Anderson allowed Oso into the vehicle to further search and, according to Officer Anderson, at that point Oso indicated on the driver's and front passenger's seats.

Officer Sutera then told Clarkson his car would be searched. He located a fanny pack on the driver's seat. Officer Sutera testified "I lifted up the fanny pack, felt an abnormally heavy object in there, which I basically immediately figured was probably a handgun of some sort." He unzipped the fanny pack and found a Ruger semiautomatic handgun and a glass pipe, which he testified "normally is used for smoking crack cocaine." Officer Sutera also found other crack pipes in the car. No drugs were found.

At the time of the stop, Officer Anderson had been a certified K-9 handler for three years. He had worked with two dogs as a canine officer. He had also undergone three months of patrol training and an eight-week course for narcotics training. In addition, he participated in about ten hours a week of maintenance training in K-9 narcotics. Oso had undergone almost ten weeks of narcotics training with Officer Anderson. Oso, however, did not complete the eight-week narcotics certification course due to an injury and lacked certification.

Clarkson moved to suppress the handgun and drug paraphernalia found in the fanny pack. He first contended the officers unreasonably exceeded the scope of the traffic stop in violation of the Fourth Amendment when they patted him down, asked him questions unrelated to the traffic violation, and began the dog-sniff for narcotics. In response to this contention, the district court concluded the stop had not been prolonged, and, even if prolonged, it did not violate the Fourth Amendment because Officer Sutera had reasonable articulable suspicion Clarkson was engaged in criminal activity.

Clarkson next contended the officers violated the Fourth Amendment by searching his vehicle without probable cause. Clarkson called dog-trainer Steven Nicely to testify as an expert on the training of narcotics dogs. Nicely testified Oso was not a qualified or well-trained narcotics dog. According to Nicely, there were a number of errors made by Oso and Officer Anderson during Oso's scrutiny of the Cadillac. The district court found "Nicely was a credible and knowledgeable witness."

Officer Anderson testified that, in his opinion as a K-9 instructor, Oso was capable and qualified to detect narcotics as of September 26, 2006. Officer Anderson also testified that another K-9 narcotics instructor, Sgt. Wendell Nope, the Utah Peace Officers Standards and Training Service Dog Training Supervisor who certifies dogs for the state, told him Oso was certifiable as a narcotics dog before Oso's injury.

-6-

The district court concluded, however, "whether Oso was fully qualified or not is not dispositive to Mr. Clarkson's motion to suppress and the court need not make that determination in this case." The court then explained Officer Sutera's reliance on Oso's alert was reasonable because there was no evidence indicating Officer Sutera knew Oso was not reliable. The district court concluded probable cause existed because "[i]n addition to the factors which gave rise to a reasonable suspicion that Mr. Clarkson was involved in criminal activity, Officer Sutera reasonably relied on Oso's indication, even if mistaken, which provided him with probable cause to search."

## III. DISCUSSION

"Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures is inadmissible at trial." *United States v. Muldrow*, 19 F.3d 1332, 1335 (10th Cir. 1994) (quotation omitted). "The proponent of a motion to suppress bears the burden of proof." *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994). In reviewing a district court's denial of a motion to suppress evidence, this court "accept[s] the district court's factual findings unless clearly erroneous," and "view[s] the evidence in the light most favorable to those findings." *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005). This court reviews de novo the district court's conclusion that the facts fail to establish a Fourth Amendment violation. *Id.*

-7-

## A.    *The Traffic Stop*

When an officer initiates a routine stop for an observed traffic violation, the constitutionality of the seizure under the Fourth Amendment is analyzed pursuant to the two-prong test provided by *Terry v. Ohio*, 392 U.S. 1 (1968).  *See, e.g., United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc) (per curiam) ("[E]ven if an officer's initial traffic stop [is] objectively justified by the officer's observation of a minor traffic violation, . . . his investigation nevertheless will be circumscribed by *Terry's* scope requirement." (quotation omitted)).

Whether the stop was justified at its inception by either probable cause to believe a traffic violation had occurred or reasonable articulable suspicion the driver committed a traffic violation is the first inquiry.  *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008).  "Second, the officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) (quotation omitted).  The traffic stop may "be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Villa-Chaparro*, 115 F.3d 797, 801-02 (10th Cir. 1997) (quotations omitted).  This court looks at the "totality of the

-8-

circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). In doing so, this court "accord[s] appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir. 1995) (citation omitted).

Clarkson does not challenge the initial traffic stop. He contends only that the officers' actions of patting him down, asking him questions unrelated to the traffic violation, and performing the dog-sniff for narcotics were not reasonably related in scope to the circumstances which justified the initial stop and were not supported by a reasonable articulable suspicion of criminal activity. The district court concluded the officers did not exceed the scope of the traffic stop, and, in the alternative, Officer Sutera had a reasonable articulable suspicion of criminal activity. As to the latter, the district court relied upon these facts: (1) Clarkson had come from a residence known for crime and drug problems in a neighborhood known for gang activity; (2) the stop occurred late at night, around 1:10 a.m; (3) there was some evidence Clarkson might be one of the suspects in a recent robbery; and (4) Clarkson's passenger appeared to be under the influence of narcotics.

The Supreme Court has held characteristics of the location of a stop, including that the location is in a "high crime area," are among "the relevant

contextual considerations" in determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. Soto-Cervantes*, 138 F.3d 1319, 1323 (10th Cir. 1998) ("While the fact that an individual is in a neighborhood known for drug activity is not sufficient by itself to support a reasonable suspicion that the individual himself is engaged in criminal activity, . . . it can support a finding of reasonable suspicion when combined with other factors." (citation omitted)). This court has also considered the time of night as a factor in determining the existence of reasonable suspicion. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997) (considering the time of night, 1:15 a.m., in concluding reasonable suspicion existed based on the totality of the circumstances). Moreover, even general descriptions of suspects or vehicles may be considered as factors supporting reasonable suspicion. *See Sanchez*, 519 F.3d at 1211, 1214-15 (concluding a witness's tip that "a man wearing a gray shirt [struck] a woman at a nearby intersection" was a factor supporting reasonable suspicion). Such general descriptions standing alone, however, will not support a finding of reasonable suspicion. *See United States v. Jones*, 998 F.2d 883, 884-85 (10th Cir. 1993) (holding officers lacked reasonable suspicion where they stopped a car based solely on the knowledge that two black men driving a black Mercedes had left a disturbance five minutes earlier). Finally, the behavior of a passenger has also been recognized by this court as a relevant factor in determining the existence of reasonable suspicion. *See United*

*States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992); *see also United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995).

In determining reasonable suspicion, we look at the totality of the circumstances resulting in the pat-down, dog-sniff, and additional questioning performed by the officers. Clarkson emerged late at night from a high-crime residence which was under surveillance at the time for criminal activity. In addition, Clarkson's passenger appeared to be under the influence of narcotics due to her fidgety behavior and slurred speech. As discussed above, each of these factors have been recognized by this court as supporting reasonable suspicion.

Clarkson focuses his argument on the vagueness of the description of the suspects and vehicle from the earlier robbery. Clarkson is correct that such a vague description standing alone would not create reasonable suspicion. *See Jones*, 998 F.2d at 885. That the description was too vague or general to alone create reasonable suspicion does not mean it cannot be considered along with the other factors in determining whether reasonable suspicion existed. *See Sanchez*, 519 F.3d at 1214-15.

Considering the totality of the factors relied upon by the district court, all of which have been recognized by this court as supporting reasonable suspicion, the district court did not err in concluding reasonable articulable suspicion existed for the questioning, pat-down, and initiation of the dog-sniff. As a consequence,

-11-

this court need not decide whether the stop was prolonged beyond its original purpose.[2]

B.      *The Vehicle Search*

Under the Fourth Amendment, "police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "This court has consistently held that probable cause can be based on alerts by trained dogs." *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997). This court has further indicated the narcotics dog must be "reliable" or "trained" in order for an alert to support probable cause. *See, e.g., Kennedy*, 131 F.3d at 1378 (stating indications by trained or reliable narcotics dogs support probable cause). A party seeking to suppress evidence bears the burden of proving the dog is unqualified. *See Moore*, 22 F.3d at 243.

The district court declined to decide whether Oso was qualified as a narcotics dog. Instead, the district court concluded probable cause existed because "[i]n addition to the factors which gave rise to a reasonable suspicion that Clarkson was involved in criminal activity, Officer Sutera reasonably relied on

---

[2]Clarkson further contends the pat-down search violated the Fourth Amendment because the officers lacked reasonable suspicion that he was armed and dangerous. We need not address this issue, however, since reasonable suspicion existed to prolong the stop, Clarkson consented to the pat-down, and there is no claim the consent was involuntary. *See United States v. Drayton*, 536 U.S. 194, 207 (2002) (explaining a search is reasonable for purposes of the Fourth Amendment where consent is voluntary).

Oso's indication, even if mistaken, which provided him with probable cause to search." The district court went on to explain that Officer Sutera's reliance on Oso's indication was reasonable because there was no evidence to suggest Officer Sutera knew Oso may not be reliable.

In its analysis, the district court appears to have applied a good-faith exception to the exclusionary rule similar to that established in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court adopted a good-faith exception to the exclusionary rule where "officers reasonably [rely] on a warrant issued by a detached and neutral magistrate" later found to be invalid. *Id.* at 913. While the district court did not discuss the factors contributing to the reasonableness of Officer Sutera's belief, presumably his belief in Oso's reliability was based on Officer Anderson arriving with Oso at the scene and stating Oso was "about ready" to be deployed. The district court reasoned that Officer Sutera's reliance on Officer Anderson's representations indicating Oso was qualified was reasonable even if mistaken.

This court has declined to extend the *Leon* good-faith exception to situations where suppression of evidence would serve to effectively deter the illegal *police* conduct that produced the Fourth Amendment violation in the first place. *United States v. Herrera*, 444 F.3d 1238, 1251 (10th Cir. 2006). Accordingly, this court applies the good-faith exception in situations where a *neutral third party* not engaged in the "competitive endeavor of ferreting out

-13-

crime" makes the mistake resulting in the Fourth Amendment violation. *Id.*
(quotation omitted); *see United States v. Johnson*, 408 F.3d 1313, 1322-23 (10th
Cir. 2005) (applying the good-faith exception to the exclusionary rule where
officers reasonably relied on administrative inspection statutes); *United States v.
Tuter*, 240 F.3d 1292, 1299-1300 (10th Cir. 2001) (applying the good faith
exception to the exclusionary rule where the magistrate judge improperly issued a
warrant without probable cause on which the police relied to conduct a search).

In declining to extend the *Leon* good-faith exception to mistakes made by
law enforcement personnel, this court has relied on the *Leon* Court's statement
that the purpose of the exclusionary rule is to deter police misconduct. *Herrera*,
444 F.3d at 1249-51. That "[t]he Supreme Court has never extended *Leon's*
good-faith exception beyond circumstances where an officer has relied in good
faith on a mistake made by someone *other than the police*" provides additional
support for this court's continued reliance on the *Leon* Court's stated purpose of
the exclusionary rule and continued refusal to extend the good-faith exception to
mistakes by law enforcement. *Id.* (emphasis added).

The Supreme Court's decision in *Arizona v. Evans*, 514 U.S. 1, 15-16
(1995), further reinforces confinement of the good-faith exception. There, in
determining whether to apply the good faith exception to an illegal search, the
Court explicitly distinguished court employees from law enforcement personnel
for purposes of the *Leon* good-faith exception. *Id.* at 14-15. The Court again

-14-

recognized "that the exclusionary rule was historically designed as a means of deterring police misconduct." *Id.* at 14. The Court went on to explain that excluding evidence based on a court employee's clerical error would not deter improper conduct, since unlike police officers, "court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime, they have no stake in the outcome of particular criminal prosecutions." *Id.* at 15 (citation omitted). The Court then created an exception to the exclusionary rule for clerical errors of court employees and remanded the case for a determination of whether a court clerk or a member of law enforcement had made the mistake in question. *See id.* at 16. Thus, the Court was willing to apply the good-faith exception only where a neutral third party, not a law enforcement member, was responsible for the error leading to the Fourth Amendment violation. *See also Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (extending *Leon's* good-faith exception where officers conducting a search relied in good faith on a statute's regulatory scheme permitting warrantless administrative searches, when the statutory regulatory scheme was later declared unconstitutional).

Here, any mistake on which Officer Sutera relied was made by a fellow officer. Were the good faith exception to apply in this circumstance, the improper police conduct of conducting a search with an untrained or unreliable dog would not be effectively deterred. Such a rule would minimize motivation for police

officers to ensure a dog is actually trained or reliable before deploying it.

Allowing the good-faith exception to apply in this situation would therefore

contravene the purpose of the exclusionary rule. *See James v. Illinois*, 493 U.S.

307, 311 (1990) ("[The exclusionary rule is the] principal mode of discouraging

lawless police conduct. Without it the constitutional guarantee against

unreasonable searches and seizures would be a mere form of words." (alteration

and quotation omitted)). The district court thus erred in concluding Officer

Sutera's reasonable reliance on Oso's reliability warranted a finding of probable

cause and declining to rule on whether Oso was qualified.[3] On remand, the

district court should determine whether Oso was trained or otherwise reliable.

While successful completion of a training course and a current certification would

be satisfactory, we do not exclude the possibility that reliability can be

established by other evidence.

## IV. CONCLUSION

Because the existence of probable cause in this situation depends not on the

reasonableness of Officer Sutera's actions, but the existence of an indication by a

---

[3]Clarkson also contends the district court erred in finding Oso indicated. The record contains expert testimony supporting both the contention Oso did indicate and the contention he did not indicate. Officer Anderson, who the defense expert testified was in the best position to view Oso's behavior, testified Oso indicated. Thus, the district court's finding that Oso indicated is not clearly erroneous.

qualified narcotics dog, we **reverse** the decision of the district court and **remand** for proceedings consistent with this opinion.