FILED
United States Court of Appeals
Tenth Circuit

February 9, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

PHILLIP DAVID HERNANDEZ,

      Defendant - Appellee.

No. 15-1116

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:14-CR-00445-CMA-1)**

James C. Murphy, Assistant U.S. Attorney (John F. Walsh, United States
Attorney, with him on the briefs), Denver, Colorado, for Plaintiff-Appellant.

Timothy P. O'Hara, Assistant Federal Public Defender (Virginia L. Grady,
Federal Public Defender with him on the brief), Denver, Colorado, for Defendant-
Appellee.

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Phillip Hernandez was charged under 18 U.S.C. § 922(g)(1) with one count of being a felon in possession of a firearm. He filed a motion to suppress the evidence retrieved after his encounter with two Denver police officers one evening, claiming the evidence was obtained in violation of the Fourth Amendment. The district court granted the motion. The government appeals, and we affirm.

**I**

On October, 20, 2014, at approximately 7:43 p.m., Denver police officers Wile Morghem and Daniel Walton were patrolling West 10th Avenue near its intersection with Mariposa Street in Denver, Colorado, in a marked police vehicle. It was dark out and the intersection was unlit. The two officers observed Mr. Hernandez walking next to a fenced construction site. The officers considered this part of town "to be a high-crime area due to its proximity to the Lincoln Park housing project and the frequency of theft and drug dealing occurring therein." Aplt. App. at 108.

As the district court found, Officer Morghem immediately suspected for several reasons that Mr. Hernandez was engaged in criminal activity:

> First, Mr. Hernandez was dressed entirely in black clothing and wore two backpacks. Second, Officer Morghem had been notified of prior thefts of construction materials and copper piping from construction sites. In particular, at least a month prior to this incident, Officer Morghem had arrested an individual for trespassing inside of the

-2-

construction area and stealing sheet metal. He also believed that Mr. Hernandez might be acting as a "lookout" for thefts – though he admitted that he did not see other individuals walking around in the construction site or notice anything occurring within the site to arouse his suspicion. Third, Morghem found it "odd" that Mr. Hernandez was walking next to the construction site, because there was a sidewalk he could have used on the other side of the street.

*Id*. at 108.

The officers pulled alongside Mr. Hernandez in their police cruiser and Officer Morghem began talking to Mr. Hernandez through the open window. During this exchange, the officers used normal speech, did not shine a spotlight or flashlight on Mr. Hernandez, and kept their firearms holstered inside the cruiser. Officer Morghem first asked Mr. Hernandez if they could talk to him, to which Mr. Hernandez responded by saying, "Yeah, what's up?" *Id.* at 109. Mr. Hernandez kept walking while he responded to Officer Morghem's question, and the officers "had to continue driving in order to follow him during their conversation." *Id.* Officer Morghem next asked Mr. Hernandez where he was coming from and what he was doing, to which Mr. Hernandez replied that he was coming from his grandmother's house and was "just trying to go home." *Id*. Officer Morghem pressed Mr. Hernandez for his grandmother's address, but Mr. Hernandez could not remember it. Up to this point, the entire conversation took place while Mr. Hernandez was walking, with the two officers driving close beside him. Officer Walton noted in the police report he filed the next day that Mr. Hernandez "tried not to stop and talk to us." *Id.* at 80.

-3-

Officer Walton asked Mr. Hernandez if he would stop so they could talk to him. Mr. Hernandez complied and stopped walking. Officer Morghem then asked Mr. Hernandez for his name and date of birth. Mr. Hernandez provided his real name but a false birth date. Although Officer Morghem did not have Mr. Hernandez's correct date of birth, he was able to pull up additional information on Mr. Hernandez via the in-car computer. He found Mr. Hernandez's mug shot and determined that he had an active warrant for a parole violation.

When Officer Morghem informed Officer Walton about the active warrant, Officer Walton put the car in park and both officers exited the vehicle to approach Mr. Hernandez. Once Mr. Hernandez saw the officers exit, he began to walk away quickly. Officer Morghem noticed Mr. Hernandez reach for his left waistband and asked him if he had a gun. Mr. Hernandez replied, "yes," and Officer Walton quickly grabbed his arm. A black revolver fell to the ground, and the officers placed Mr. Hernandez under arrest.

Mr. Hernandez was indicted on one count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). He filed a motion to suppress, alleging that the seizure of his person was unreasonable under the Fourth Amendment because "it was not based on reasonable, articulable suspicion." Aplt. App. at 11. After an evidentiary hearing, the district court granted the motion, concluding that the officers had "seized" Mr. Hernandez without reasonable suspicion to do so, in violation of the Fourth Amendment. Regarding the "seizure," the court held that

-4-

Officer Walton's request to Mr. Hernandez to stop walking was "a show of authority such that a reasonable person in [his] position would not have felt free to decline the Officers' requests or terminate the encounter." *Id.* at 114. With respect to reasonable suspicion, the court reasoned that the officers had nothing more than inchoate and inarticulate hunches for suspecting Mr. Hernandez of criminal activity.

**II**

We first address an issue that arose after briefing and oral arguments were completed in this case when the Supreme Court issued its opinion in *Utah v. Strieff*, 136 S. Ct. 2056 (2016). The Court determined that the attenuation doctrine—a rule that allows courts to admit illegally obtained evidence as long as the connection between the evidence and the illegal method is sufficiently remote or attenuated—applies to situations where police officers illegally stop someone who they later realize has a valid, pre-existing, and untainted arrest warrant. *Id.* at 2063. After the Court's decision in *Strieff*, the government in this case filed a supplemental authority letter pursuant to Fed. R. App. P. 28(j) ("Rule 28(j) letter"), requesting that we remand the case to the district court to determine if, and to what extent, *Strieff* applies to these facts. Mr. Hernandez contended in response that the government had waived the attenuation argument by failing to assert it below. We agree with Mr. Hernandez.

-5-

"It is well established that we will not consider issues raised for the first time in a Rule 28(j) letter . . . because, in part, the language of Rule 28(j) 'underscores that an appellant's supplemental authority must relate to an issue previously raised in a proper fashion . . . .'" *Thacker v. Workman*, 678 F.3d 820, 842 (10th Cir. 2012) (citations omitted) (quoting *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004)). In *Thacker*, we rejected a party's attempt to argue the impact of a recently decided Supreme Court case, which held that federal habeas courts could hear ineffective-assistance-of-trial-counsel claims that were not raised in the initial-review collateral proceeding if the defendant lacked effective post-conviction counsel. *Id*. at 842 (citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)). Because Mr. Thacker "most certainly could have argued in his federal habeas petition . . . that ineffective assistance of post-conviction counsel was the 'cause' for his failure to raise his ineffective assistance of trial counsel claim" but failed to do so until filing his Rule 28(j) letter, we refused to consider the issue. *Id*.

Similarly, even though the government in this case could not have predicted the outcome of *Strieff*, it could have argued, just as the State of Utah did in *Strieff*, that the attenuation doctrine should be applied in situations where a defendant is illegally stopped but the police later discover a valid, pre-existing, and untainted arrest warrant. In fact, the government had ample precedent to argue this point because two of our sister circuits had already adopted the same

-6-

approach. *See United States v. Green*, 111 F.3d 515, 521-23 (7th Cir. 1997) ("Where a lawful arrest pursuant to a warrant constitutes the 'intervening circumstance' (as in this case), it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated."); *see also United States v. Simpson*, 439 F.3d 490, 495-97 (8th Cir. 2006) (holding the defendant's "outstanding arrest warrant constitute[d] an extraordinary intervening circumstance that purge[d] much of the taint associated with the officers' unconstitutional conduct").

We hold that the government has waived its attenuation argument.[1]

# III

"In reviewing a district court's ruling on a motion to suppress evidence, we view the evidence in the light most favorable to the prevailing party and accept the district court's findings of fact unless they are clearly erroneous." *United*

---

[1] While we do not generally consider new issues on appeal, we do have discretion to consider new arguments based on "changes in governing law arising during the pendency of the appeal." *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 798 n.1 (10th Cir. 2007) (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1222 (10th Cir. 1996)). We see two reasons not to exercise that discretion here. First, all of the parties in *Green* agreed that the appellate record was sufficiently developed to allow proper consideration of the new issue without remand. *Id*. The same cannot be said about this case. Second, *Strieff* does not change governing law; it only supplements it by applying the factors from *Brown v. Illinois*, 422 U.S. 590 (1975), and concluding that suppression was unwarranted. *See Strieff*, 136 S. Ct. at 2061-62.

*States v. Oliver*, 363 F.3d 1061, 1065 (10th Cir. 2004) (quoting *United States v. Massie*, 65 F.3d 843, 847 (10th Cir. 1995)). "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Vaughn*, 765 F.3d 1174, 1180 (10th Cir. 2014) (quoting *In re Peterson Distrib., Inc.*, 82 F.3d 956, 959 (10th Cir. 1996)). In making this determination, we keep in mind that "[i]t is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference." *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999) (citing *United States v. Hargus*, 128 F.3d 1358, 1361 (10th Cir. 1997)). "The ultimate question of whether a search and seizure was reasonable under the Fourth Amendment is a question of law that we review de novo." *Oliver*, 363 F.3d at 1065 (quoting *Massie*, 65 F.3d at 847).

While the defendant "bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he . . . was 'seized')," *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994), the "government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). We address in turn the government's contentions that the district court erred in holding Officers Walton and Morghem seized Mr. Hernandez without reasonable suspicion in violation of

the Fourth Amendment.

## A. Whether a Seizure Occurred

The Fourth Amendment, applied to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), prohibits unreasonable seizures by law enforcement officers.  U.S. Const. amend. IV.  But "[t]he Fourth Amendment does not proscribe all contact between the police and citizens."  *INS v. Delgado*, 466 U.S. 210, 215 (1984).  For instance, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen."  *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)).  These are referred to as consensual encounters which do not implicate the Fourth Amendment.  *See United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006).  It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a 'seizure' has occurred."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the

-9-

police presence and go about his business.'"  *Bostick*, 501 U.S. at 437 (quoting

*Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).  "[T]he test allows officers to

make inquiries so long as they don't throw their official weight around unduly."

*United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990).  There are no

*per se* rules that govern this inquiry; "[r]ather, every case turns on the totality of

the circumstances presented."  *United States v. Hill*, 199 F.3d 1143, 1147 (10th

Cir. 1999) (quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994)

(en banc)).

We have enumerated a non-exhaustive list of factors to be considered in

determining whether a reasonable person would feel free to terminate his

encounter with the police:

> the location of the encounter, particularly whether the defendant is in
> an open public place where he is within the view of persons other
> than law enforcement officers; whether the officers touch or
> physically restrain the defendant; whether the officers are uniformed
> or in plain clothes; whether their weapons are displayed; the number,
> demeanor and tone of voice of the officers; whether and for how long
> the officers retain the defendant's personal effects such as tickets or
> identification; and whether or not they have specifically advised
> defendant at any time that he had the right to terminate the encounter
> or refuse consent.

*Lopez*, 443 F.3d at 1284 (quoting *United States v. Spence*, 397 F.3d 1280, 1283

(10th Cir. 2005)).  Moreover, when police officers pursue a citizen in their squad

car while the citizen is on foot, courts will consider whether the officers activated

their siren or flashers, operated their car in an aggressive manner to block the

citizen's course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt. *Chesternut*, 486 U.S. at 575. "Although no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (quoting *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006)).

Turning to this case, the encounter in question began when Officers Morghem and Walton pulled alongside Mr. Hernandez in their police cruiser and began asking him questions, which he answered as he continued to walk down the street. This was not a seizure. *See Bostick*, 501 U.S. at 434 ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."). The nature of a police-citizen encounter can change, however, and "what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa." *United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012) (quoting *United States v. Zapata*, 997 F.2d 751, 756 n.3 (10th Cir. 1993)). That was the case here.

The district court correctly identified the standards applicable to determining whether a police-citizen encounter is consensual or a seizure. The court recognized that "[n]o *per se* or absolute rules govern the inquiry . . . ; rather, every case turns on the totality of the circumstances presented." Aplt. App. at 111. Citing *Spence*, 397 F.3d at 1283, the court detailed the factors

-11-

relevant to making this determination, as we have done *supra*.

Applying these standards, the district court determined the facts here weighed in favor of concluding that the officers' conduct had crossed the coercive line and that a seizure had occurred. A key factor was Officer Walton's request that Mr. Hernandez stop walking, but the court also emphasized that there were two uniformed officers closely following Mr. Hernandez in a police car, it was dark and there was no evidence the encounter occurred within the view of other persons, and the officers did not advise Mr. Hernandez he had the right to terminate the encounter. Aplt. App. at 115-16. The Supreme Court has recognized that "the very presence of a police car driving parallel to a [] pedestrian could be somewhat intimidating."[2] *Chesternut*, 486 U.S. at 575. It was in this setting that Officer Walton "requested" Mr. Hernandez to stop walking. As we have noted above, even Officer Walton recognized in his contemporaneous police report that Mr. Hernandez "tried not to stop to talk to

---

[2] Of course, we recognize that "this kind of police presence does not, standing alone, constitute a seizure." *Id.* We also recognize the ultimate conclusion in *Chesternut* was that no seizure had occurred. *Id.* at 576. We are merely highlighting the fact that Officers Walton and Morghem were driving parallel to Mr. Hernandez in their police cruiser and that the Supreme Court has stated this exact fact could be intimidating to a pedestrian. It is not dispositive; it simply further illustrates the coerciveness of the circumstances leading up to Officer Walton's request that Mr. Hernandez stop walking, which is the point at which the Fourth Amendment was implicated.

us."[3] Aplt. App. at 80. Reading the circumstances of this case, as we must, in the light most favorable to the prevailing party, Mr. Hernandez, we are persuaded a reasonable person would have believed that compliance with the "request" was not optional.

The government takes issue with numerous findings made by the district court and we address each in turn. The government first contends the court failed to adequately address the *Spence* factors, claiming the court's treatment of the factors was cursory to its overriding concern that Officer Walton asked Mr. Hernandez to stop walking so they could talk to him. The government maintains the district court erred in giving so much weight to Officer Walton's request because "[o]fficers are free to approach individuals on the street and question them." Aplt. Br. at 9. While this is true, *Spence*'s list of factors is non-exhaustive, and the district court did not err in heavily weighing Officer Walton's request for Mr. Hernandez to stop walking in light of the other circumstances present that evening. Mr. Hernandez was in an unlit area on a dark night with no one else around and with two uniformed and armed officers closely following him in a marked police car after he had indicated by walking away that he did not want to stop to talk with them. The Court made clear in *Chesternut*, 486 U.S. at

---

[3] We do not include this to say that Officer Walton's subjective intentions matter to the question of whether Mr. Hernandez was seized; rather, we use it to illustrate what the situation objectively looked like from a contemporaneous account.

573, that "what constitutes a restraint on liberty prompting a person to conclude he is not free to 'leave' will vary, not only with the particular police conduct at issue, *but also with the setting in which the conduct occurs*." (Emphasis added).

The government maintains the district court erred in finding that the public exposure factor favored Mr. Hernandez. It reasons that whether anybody is around to see the questioning is irrelevant as long as the questioning occurs in a public place. We disagree. Our cases view police-citizen interactions in nonpublic places and police-citizen interactions in the absence of other members of the public similarly. *See Spence*, 397 F.3d at 1283 ("This court does consider 'interaction in a nonpublic place . . . and the absence of other members of the public' as factors pointing toward a nonconsensual encounter." (quoting *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996))).

The government also disagrees with the district court's treatment of the fact that multiple officers were involved, arguing that "this court should reject the district court's implicit holding that an officer must approach a subject alone, or his presence will be deemed coercive." Aplt. Br. at 11. But that is not what the district court held. It merely stated that the number of officers is one of many factors to consider, citing one of our cases for the proposition that "the presence of more than one officer increases the coerciveness of an encounter." *United States v. Ward*, 961 F.2d 1526, 1533 (10th Cir. 1992), *overruled on other grounds by Little*, 18 F.3d at 1504. Although the presence of two uniformed and armed

officers does not automatically transform every police-citizen encounter into a nonconsensual one, it is a relevant factor.

"[A]n individual is 'seized' when he has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way." *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999) (citation omitted). "The question of whether an encounter was consensual 'calls for the refined judgment of the trial court.'" *Id*. at 1409 (quoting *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990)). Considering the totality of the circumstances here, that there were two uniformed police officers driving closely alongside Mr. Hernandez in the dark with no one else around, and that Mr. Hernandez did not stop walking until one officer asked him to stop even though he was answering the officers' questions, the district court did not err in concluding there was a show of authority by Officers Morghem and Walton sufficient to constitute a seizure under the Fourth Amendment.

The dissent claims that *United States v. Drayton*, 536 U.S. 194 (2002), *INS v. Delgado*, 466 U.S. 210 (1984), *Florida v. Rodriguez*, 469 U.S. 1 (1984) (per curiam), and *United States v. Mendenhall*, 446 U.S. 544 (1980), where the Supreme Court held that each police-citizen encounter was not a seizure, represent "far more authoritative encounters between officers and citizens" than does this case. Dissent at 1. We disagree. In *Rodriguez*, 469 U.S. at 3-4, the defendant was stopped in an airport by two detectives in plain clothes. One

-15-

officer showed the defendant his badge and asked if he could talk to him. The Court held this initial encounter was not a seizure. *Id.* at 5-6. This encounter—with plain clothes detectives in a very public place where the defendant was never asked to stop walking as he was moving away from the officer—is nothing like the encounter in the present case, which took place in an isolated location on a dark night with uniformed police officers closely following defendant in a police car. In fact, in *Rodriguez*, the Court went on to "[a]ssum[e], without deciding, that after [the defendant] agreed to talk to the police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage, there was a 'seizure.'" *Id.* at 6.

In *Delgado*, 466 U.S. at 212, multiple INS agents conducted a survey of a factory in search of undocumented immigrants. Agents were posted at the doors while other agents walked through the factory and stopped employees to ask about their citizenship status. *Id.* The Court held that no seizure occurred. *Id.* at 221. But the degree of coerciveness of an encounter in a factory with numerous people around during work time is completely different than an encounter with the police alone at night, on an empty street. Moreover, a key premise of the *Delgado* holding was that "when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Id.* at 218.

In *Mendenhall*, 446 U.S. at 548, DEA agents stopped a woman at the airport, asked for her ID, and returned it after they looked at it. They then asked her if she would follow them to answer a few more questions, and she did so. *Id.* A plurality of the Court assumed without deciding that the initial stop was a seizure and then concluded it was supported by reasonable suspicion. *Id.* at 560-66 (Powell, J., concurring). Only two Justices held the initial stop was consensual. *Id.* at 555 (opinion of Stewart, J.). A majority of the Court held, and this is what the dissent focuses on, that the encounter between Mendenhall and the officers was consensual as they walked from the concourse to the DEA office. *Id.* at 557-58. From this, the dissent concludes that if the encounter in *Mendenhall* was consensual, so too was the encounter here. But, unlike the present case, the setting in *Mendenhall* was a public airport and there was never a moment after the initial encounter when the police asked Ms. Mendenhall to stop behaving in a certain manner (e.g., to stop walking) while she was answering their questions.

Finally, in *Drayton*, 536 U.S. at 198, two officers dressed in plain clothes boarded a bus and asked the defendant if he had any bags with him. The defendant responded affirmatively and let them check his bag. *Id*. at 199. When the search did not turn up contraband, the officers asked if they could check his person and the defendant again cooperated. *Id*. The Court held there was no seizure. *Id*. at 200. It disagreed with the Eleventh Circuit's "*per se* rule that

-17-

evidence obtained during suspicionless drug interdiction efforts aboard buses must be suppressed unless the officers have advised passengers of their right not to cooperate and to refuse consent to search[,]" ultimately concluding that the focus should be on the coerciveness of the encounter and not the fact that it took place on a bus. *Id*. at 202.

As we have explained excessively now, Mr. Hernandez was alone at night being closely followed by a police car with two uniformed and armed officers who asked him to stop walking even though he was answering their questions. In contrast, the defendant in *Drayton* was surrounded by people, was questioned by plainclothes officers, and was never asked to stop acting in a particular way. The dissent describes the bravery it would have taken for the defendant in *Drayton* to terminate his encounter with the officers but fails to mention that he "would have been allowed to do so without argument." *See id.* at 198. Mr. Hernandez attempted the very act that would have been permitted in *Drayton*, but he was asked to halt.

We admit this is a close case and there is a dearth of case law directly on point with the facts here, but to claim that numerous Supreme Court precedents have held "consensual far more authoritative encounters between officers and citizens," Dissent at 1, is simply incorrect and misleading. Reading the record in the light most favorable to Mr. Hernandez, *see United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998), we cannot say the district court erred in

-18-

concluding that a reasonable person in Mr. Hernandez's circumstances would not have felt free to leave.

### B. Whether the Officers had Reasonable Suspicion to Stop Mr. Hernandez

Because the seizure of Mr. Hernandez constituted an investigative detention, also known as a "*Terry* stop," it can only be justified if the officers had specific and articulable facts and rational inferences drawn from those facts giving rise to a reasonable suspicion that Mr. Hernandez was involved in criminal activity. *See Terry*, 392 U.S. at 21; *see also Werking*, 915 F.2d at 1407. Because a *Terry* stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). As the Court in *Sokolow* reiterated, *id.*, the standard articulated in *Terry* does not "invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." 392 U.S. at 22. Rather, the Fourth Amendment requires at least "'some minimal level of objective justification' for making [a] stop." *Sokolow*, 490 U.S. at 7 (quoting *Delgado*, 466 U.S. at 217). Importantly, it is the government's burden to prove the reasonableness of the officer's suspicion. *Simpson*, 609 F.3d at 1146.

As the district court recognized, aplt. app. at 113, "the existence of objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997). The district court held that the generalized explanation

-19-

provided by the officers for the detention amounted to "nothing more than inchoate and inarticulate hunches, rather than a 'particularized and objective basis,' for suspecting Mr. Hernandez of criminal activity." Aplt. App. at 117-18 (citing *Terry*, 392 U.S. at 22; *United States v. Fisher*, 597 F.3d 1156, 1158-59 (10th Cir. 2010)). The court analyzed the four reasons articulated by the officers, and argued by the government, to support reasonable suspicion:

> (1) Mr. Hernandez was walking next to a construction site which had been the previous target of construction material thefts; (2) he was walking in a "high crime" area (with regard to theft, gang activity, and drug dealing); (3) he was not using the sidewalk located on the other side of the street; and (4) he was wearing all black clothing and carrying two backpacks.

Aplt. App. at 117.

First, the court held that merely walking next to a construction site that was previously the target of thefts did not support reasonable suspicion because Mr. Hernandez was not, for example, inside the fence, carrying construction materials, or acting as a lookout. As we said in *Fisher*, 597 F.3d at 1158-59, "[a] police officer cannot legally detain a person simply because criminal activity is afoot. The particular person that is stopped must be suspected of criminal activity." Second, the district court noted that, while relevant, the location of the stop in a high-crime area is "not sufficient by itself to support a reasonable suspicion" that the individual himself is engaged in criminal activity. Aplt. App. at 113; *see also United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009). Third, the court

-20-

stated that Mr. Hernandez's failure to use the sidewalk located on the other side of the street did not support reasonable suspicion because "such behavior [was] perfectly innocuous—Mr. Hernandez might well have decided to take a shorter route to his destination, or to see the progress of the neighborhood's latest high-rise development." Aplt. App. at 118. The court pointed out that "[t]he government did not explain why suspicious persons are less likely to choose the sidewalk." *Id.* Nor does the government do so on appeal. Finally, the district court was not persuaded that Mr. Hernandez's all black clothing and two backpacks supported reasonable suspicion because if "black clothing were sufficient to confer reasonable suspicion, it could subject the ambling public (or, at least its Hispanic members) 'to virtually random seizures, inquisitions to obtain information which could then be used to suggest reasonable suspicion, and arbitrary exercises of police power." *Id*. at 118-19 (quoting *Wood*, 106 F.3d at 948).

Notably, the government does not contend the district court incorrectly evaluated these facts. Nor does the government even claim the district court erred in concluding the four factors the officers articulated were not sufficient to constitute reasonable suspicion that Mr. Hernandez was engaged in criminal activity, a position with which we agree.

The government contends instead that the district court failed to account for one "critical undisputed fact": that Mr. Hernandez said he was coming from his

grandmother's house but could not recite her address. Aplt. Br. at 16. The government asserts that "[w]hen this is factored in, the circumstances suffice to show particularized suspicion of criminal activity." *Id*. at 17. But the government never argued in district court, either in its response to the motion to suppress, Aplt. App. at 25-26, or in its argument at the evidentiary hearing, *id.* at 94-100, that Mr. Hernandez's failure to recall his grandmother's address was a factor supporting reasonable suspicion. Nor does the government offer any excuse for its failure to make this argument previously.

"In order to preserve the integrity of the appellate structure, we should not be considered a 'second-shot' forum, a forum where secondary, back-up theories may be mounted for the first time. Parties must be encouraged to 'give it everything they've got' at the trial level." *Tele-Communications, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997) (quoting *Anshutz Land & Livestock Co. v. Union Pac. R.R.*, 820 F.2d 338, 344 n.5 (10th Cir. 1987)). We, therefore, need not address the new reasonable suspicion argument the government makes for the first time on appeal. *See United States v. Dewitt*, 946 F.2d 1497, 1499 (10th Cir. 1991) ("[T]he government has waived this issue by failing to raise it below. We will not consider issues which are raised for the first time on appeal unless a party

demonstrates an impediment which prevented raising the argument below."

(citing *United States v. Orr*, 864 F.2d 1505, 1508 (10th Cir. 1988))).[4]

In any event, however, we do not consider Mr. Hernandez's failure to know

his grandmother's street address worthy of much weight in determining whether

the officers had reasonable suspicion to detain him, unlike the dissent.  In

analyzing the totality of the circumstances, "common sense and ordinary

experience are to be employed and deference is to be accorded to a law

enforcement officer's ability to distinguish between innocent and suspicious

actions." *De la Cruz-Tapia*, 162 F.3d at 1277 (quoting *Wood*, 106 F.3d at 946).

Tellingly, neither officer in this case mentioned in his testimony that this fact

made him suspicious, which is understandable because ordinary experience tells

us that a grandchild who knows the familiar way to his grandmother's house may

well not know her exact street address.  *Cf. United States v. Santos,* 403 F.3d

1120, 1131 (10th Cir. 2005) (failure to know mother's telephone number not

entitled to much weight in reasonable suspicion analysis considering that "[m]any

modern people, even innocent ones, program important phone numbers into their

telephones and no longer memorize them").  As we said in *Santos*, "[i]t may be

lamentable that" a grandchild doesn't know his grandmother's street address, "but

it is hardly an indication that crime is afoot."  *Id.*  We are thus more persuaded by

---

[4] This case is not like *United States v. Moore*, 795 F.3d 1224, 1229 n.2 (10th Cir. 2015), where there was no issue of waiver.

the police officers' failure to find this fact suspicious than we are by the dissent's opposite conclusion.[5]

The government ultimately argues the district court erred by not affording the officers the deference they deserved. But as we have explained, while "deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions . . . [i]nchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion." *Wood*, 106 F.3d at 946. The district court held that Officers Morghem and Walton stopped Mr. Hernandez based on inchoate suspicions and unparticularized hunches, and we are not persuaded the court erred in making that determination.

We AFFIRM.

---

[5] The record is virtually bare in regard to Mr. Hernandez's inability to recall his grandmother's address. The only mention of it was during Officer Morghem's testimony at the suppression hearing where he stated, "I asked where was his grandma's house and he could not provide me that address." Aplt. App. at 43. This, standing alone, contrary to the government's and dissent's assertions, is neither inconsistent nor evasive. It might be different, for instance, had Officer Morghem testified to asking a follow-up question regarding the approximate location of Mr. Hernandez's grandmother's house and then testified that Mr. Hernandez could not provide any general information about such residence. That, however, is not what occurred, and it further underscores our point above that both sides should present all their arguments to the district court.

No. 15-1116, <u>United States v. Hernandez</u>

**BRISCOE**, Circuit Judge, dissenting.

I respectfully dissent. The majority suggests that when police officers in a vehicle merely ask a pedestrian to stop walking to continue their conversation, the pedestrian has been seized. Applying Supreme Court precedent holding consensual far more authoritative encounters between officers and citizens, I would conclude that Hernandez gave the Denver Police Officers his name in the course of a consensual encounter. In the alternative, the Officers had reasonable articulable suspicion to stop Hernandez.

**I**

On October 20, 2014, Officers Morghem and Walton were on patrol in Denver, Colorado. After sunset, they arrived in their marked patrol car at the unlit intersection of West 10th Avenue and Mariposa Street. The intersection is located in a high crime area.

As a result of the ongoing construction of a high-rise at that intersection, there was no sidewalk along the site or any cars parked there. The construction site also was fenced in, in part for security reasons, and the police had responded to thefts in construction areas nearby. Officer Morghem was especially alert to and suspicious of individuals near this specific construction site because a few months prior to that evening, he had arrested a trespasser inside that fenced-in area of the site.

Officer Morghem observed through the darkness a person near the corner, clad in black clothing, and wearing two backpacks. When first seen, the man, later identified as Hernandez, was in the street and walking next to the fence. Given his knowledge of the area and prior thefts, Officer Morghem was immediately suspicious when he saw Hernandez next to the fence. In addition, Officer Morghem had experience arresting "lookout[s]." Aplt. App. at 108. He therefore was concerned that the individual he saw

outside of the fence could be working as a lookout for others inside. Officer Morghem also found Hernandez's behavior "odd" in that there was a sidewalk on the other side of the street, but Hernandez was not using it. Id.

Officer Walton, who was driving the patrol car, pulled up next to Hernandez and started talking to him as Hernandez continued to walk. The patrol car was approximately five feet from Hernandez. Officer Morghem asked him if "they could talk to him," and Hernandez replied, "yeah, what's up?" Id. at 109. Because Hernandez kept walking, Officer Walton drove the car alongside to keep pace.

Officer Walton then asked Hernandez "where he was coming from and what he was doing . . . ." Id. Hernandez said that he "was coming from his grandmother's house and was 'just trying to go home.'" Id. Officer Morghem asked "where his grandmother lived," to which Hernandez replied that he "didn't know the address." Id.

At some point thereafter, Officer Walton "asked Hernandez to stop so that they could talk to him, and he complied." Id. Next, the district court found, the Officers asked Hernandez for his name and date of birth. Hernandez provided his name, but a false birth date. The "entire conversation" took, "at the most," two minutes. Id.

Officer Morghem's search of the police department's database revealed that Hernandez had an outstanding arrest warrant. Officer Walton then parked the car. The Officers stepped out of the patrol car, as Hernandez "started walking away 'quickly'" from them. Id. at 110. As Officer Morghem approached Hernandez, he noticed Hernandez reaching for his waistband. Officer Morghem asked if Hernandez "had a gun." Id. Hernandez answered, "'yes,' and a gun fell on the ground." Id. The Officers arrested Hernandez and retrieved the gun.

## II

Hernandez was subsequently indicted on one count of knowingly possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress arguing that he was unlawfully seized at the time he identified himself. He contended that by asking him to stop, the Officers seized him without reasonable suspicion and improperly discovered his identity, and thus the warrant and firearm. The government responded that the encounter was consensual or, alternatively, was an investigative detention supported by reasonable suspicion. The district court granted the motion, determining that when Hernandez was asked to stop, the encounter became a seizure, unsupported by reasonable suspicion.

## III

In reviewing the district court's order, we view "the evidence in the light most favorable to the prevailing party," and "defer to the district court's findings on questions of fact, reviewing only for clear error. We review questions of law de novo." United States v. Mendoza, 817 F.3d 695, 698 (10th Cir. 2016) (citations omitted). Specifically, we review de novo "the ultimate determination of reasonableness under the Fourth Amendment." United States v. Moore, 795 F.3d 1224, 1228 (10th Cir. 2015) (quotation marks and citation omitted).

### *1. Was the Encounter Consensual?*

We recognize three categories of encounters between police officers and citizens:

> (1) consensual encounters which do not implicate the Fourth Amendment;
> (2) investigative detentions which are Fourth Amendment seizures of
> limited scope and duration and must be supported by a reasonable suspicion
> of
> criminal activity; and (3) arrests, the most intrusive of Fourth Amendment
> seizures and reasonable only if supported by probable cause.

3

United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012) (citation omitted).

With respect to consensual encounters, the Supreme Court has long held that,

> [O]fficers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. . . . Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . provided they do not induce cooperation by coercive means.

United States v. Drayton, 536 U.S. 194, 200–01 (2002) (citations omitted).

Specifically, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." INS v. Delgado, 466 U.S. 210, 216 (1984). But if a police officer "detain[s]" a person "for the purpose of requiring him to identify himself," the officer has "performed a seizure of his person subject to the requirements of the Fourth Amendment." Brown v. Texas, 443 U.S. 47, 50 (1979). Thus, the threshold issue is whether Hernandez's encounter with the Officers was consensual. I would conclude that it was.

"We review de novo the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment." United States v. Rogers, 556 F.3d 1130, 1137 (10th Cir. 2009) (quotation marks and citation omitted). The following facts are relevant:

> (1) the *threatening* presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

4

Id. at 1137–38 (emphasis added) (citation omitted).

This "list of factors is not exhaustive, nor is any one factor dispositive." Id. at 1138 (citation omitted). While relevant, "[o]nce such a consensual encounter begins, an officer is not required to inform a suspect that he does not have to answer the officer's questions or that he is free to leave at any time." United States v. Wallace, 429 F.3d 969, 975 (10th Cir. 2005) (citation omitted). To decide "whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Madden, 682 F.3d at 925 (quotation marks and citation omitted). That reasonable person inquiry "focuses on the objective viewpoint of one in the defendant's circumstances." United States v. Carbajal-Iriarte, 586 F.3d 795, 801 (10th Cir. 2009) (citation omitted).

In the present case, Hernandez agreed to speak with the Officers and continued walking while answering their questions, responding to every question without objection. When Officer Walton asked Hernandez to stop walking, Hernandez did so without objection. Officer Morghem then asked Hernandez to identify himself, and he complied. Approximately two minutes elapsed from the beginning of the conversation until the discovery of the outstanding warrant.

Supreme Court precedent establishes that the circumstances here do not support the legal conclusion that Hernandez was seized. In United States v. Mendenhall, after Mendenhall was arrested for possessing narcotics, she argued that she was seized from the moment that agents approached her in an airport concourse and asked her questions.

5

446 U.S. 544, 547–50 (1980).  The majority here notes that only a plurality of the Mendenhall Court held the initial encounter, during which Mendenhall's identification and plane ticket were confiscated, was consensual.  See id. at 555 (Stewart, J., plurality).  Today's majority also attempts to distinguish Hernandez's circumstances from Mendenhall's by framing the question as whether Mendenhall was asked "to stop behaving in a certain manner (e.g., to stop walking) while she was answering [the agents'] questions."  Majority Op. at 17.

But Mendenhall's import is that the majority of the Court held that the encounter was consensual *after* Mendenhall's effects were returned.  446 U.S. at 557–58 (Stewart, J., majority).  And the Court held that the agents' request that Mendenhall accompany them to a far-off, enclosed, and government-controlled location did not transform the encounter into a seizure.  Id.  Specifically, the Court stated that Mendenhall "was not told that she had to go to the office, but was simply asked if she would accompany the officers" after her "ticket and identification" had been "returned to her," a "voluntarily consented to" encounter.  Id. at 558.  The majority here fails to draw any meaningful distinction between an officer's request that a person preparing to catch a flight accompany him to an airport security office to continue their consensual conversation and an officer's request that a person stand in place to do the same.  If Mendenhall could have refused the request to move to the agents' office, Hernandez could have refused the request to stop here.

Further, in Florida v. Rodriguez, the defendant was being followed by several narcotics officers through an airport.  469 U.S. 1, 3–4 (1984) (per curiam).  One of Rodriguez's compatriots noticed the officers and warned Rodriguez to "[g]et out of

6

[t]here." Id. Rodriguez then "attempted to move away from" the officers. Id. at 4. A detective "showed his badge and asked [Rodriguez] if they might talk," and "suggested that they move approximately 15 feet" away. Id. The detective requested identification and, seeing Rodriguez had none, asked his name. Id. The Court held that "[t]he initial contact between the officers and [Rodriguez], where they simply *asked* if he would *step aside* and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest." Id. at 5–6 (emphasis added) (citations omitted).

The majority is correct that the Court also "[a]ssum[ed], without deciding, that *after* [Rodriguez] agreed to talk with the police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage," he was seized. Id. at 6 (emphasis added). But the majority is mistaken if what it means to suggest is that the Court held that Rodriguez was seized once he complied with the request to move aside, implying Hernandez was seized when he stopped here. Just the opposite conclusion is true. The Court held that when the presumptive seizure occurred, it was supported by "justifiable suspicion," based, in part, on "the contradictory statements concerning the identities of" Rodriguez and his compatriot, statements they made *after* they complied with the officers' request to move locations. Id. Rodriguez thus confirms that Hernandez was not seized merely because the Officers' *requested* he alter his movements to continue their encounter.

The majority also attempts to distinguish Rodriguez on the basis that Hernandez was in an "isolated location" at night. Majority Op. at 16. But that does not follow because Hernandez was not isolated on the "very public" street and, the majority agrees, he had been engaged in a consensual nocturnal encounter just moments earlier. Id.

7

Mendenhall and Rodriguez belie the conclusion that the Officers could not ask Hernandez to stop walking without having seized him.

Moreover, although the district court noted that Hernandez's encounter was with two officers, it did not find that their presence was threatening. Indeed, both Officers remained in the car, weapons holstered and unseen. See Rogers, 556 F.3d at 1137–38. The district court also suggested that driving the police car five feet away from Hernandez might have made a reasonable person feel unable to terminate the conversation. But the district court did not find, and no evidence suggests, that Officer Walton drove in an aggressive manner or blocked Hernandez's route.

To explain its agreement with the district court, the majority cites Michigan v. Chesternut for the proposition that, "the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating . . . ." 486 U.S. 567, 575 (1988). But the majority relegates the end of that sentence to a footnote. The Court stated that "this kind of police presence does not, standing alone, constitute a seizure." Id. The majority's claim that Chesternut "simply further illustrates the coerciveness of the circumstances leading up to Officer Walton's request that Mr. Hernandez stop walking" grafts Chesternut's conclusion onto Hernandez's circumstances while ignoring Chesternut's facts. Majority Op. at 12 n.2. The Court held that four officers' "pursuit" of a pedestrian—during which they "dr[o]ve alongside him" in their police cruiser as he *ran away from them*—was *not* a seizure. Chesternut, 486 U.S. at 576. If those officers' actions were merely "somewhat intimidating," id. at 575, then Officer Walton's passive driving maneuvers here hardly qualify as coercive. Thus, Chesternut simply underscores that Hernandez's consensual encounter continued even as the Officers kept pace with him as he walked.

8

The district court next emphasized that the Officers "freely admit[ted] that when citizens walk away from them, these citizens are **not** indicating that they are affirmatively consenting to being questioned by the Officers." Aplt. App. at 116. The majority treats this as highly significant, noting that Officer Walton admitted that Hernandez "tried not to stop to talk to" them. Majority Op. at 12–13 (quoting Aplt. App. at 80). The majority appears to disclaim reliance on the district court's legal analysis of *why* that request is "key" to its determination. But the majority must be relying on the district court's erroneous legal analysis when it calls Officer Walton's "request that Mr. Hernandez stop walking" a "key factor" to its determination that Hernandez was seized. Id. at 12. For the majority offers no substitute legal analysis to explain why the request is "key" to its holding.

Moreover, the district court's analysis of that "key factor" is triply flawed. First, the district court's discussion of Officer Walton's subjective views of the situation come from Officer Walton's report, which was not admitted into evidence and for which we have no context. The majority does not even address this error; it also relies on the report.

Second, in any event, the Officers' feelings regarding whether Hernandez wanted to speak to them are irrelevant to analyzing this question of law. United States v. Kimoana, 383 F.3d 1215, 1224 (10th Cir. 2004). The majority admits that such "subjective intentions" are irrelevant, but does not explain what facts, as opposed to Officer Walton's feelings, demonstrate that "the situation objectively looked [coercive] from a contemporaneous account." Majority Op. at 13 n.3. Rather, the undisputed objective facts are that Hernandez answered every question posed to him, did not remain silent, and never said that he wished to end the walk-and-talk encounter. Cf. United

9

States v. Jones, 701 F.3d 1300, 1305–07 (2012).

Third, even if those errors were not fatal to its conclusion, the district court's underlying premise was tautological—the request that Hernandez stop walking does not prove that request transformed the encounter into a seizure. "The exploitation issue focuses solely on [a] defendant's *grant* of consent, not on the bare request, or the reasons underlying it. While the police may exert coercion in the *manner* in which they *request* [a] defendant's consent, the request itself . . . is not exploitation." United States v. Carson, 793 F.2d 1141, 1149 (10th Cir. 1986). Thus, the relevant question is whether the *circumstances surrounding* the request or the *manner* in which it was made objectively compelled compliance. Id. The request *itself* is not determinative of whether Hernandez's free will was overpowered. Id. That he complied also does not answer whether a reasonable person would have felt compelled to do so. The majority's tacit reliance on the district court's analysis for the legal import of Officer Walton's request necessarily suffers from these same errors.

Further, the Officers did not seize any of Hernandez's personal effects, touch him, verbally threaten him, or brandish their weapons. The majority claims that "the presence of two uniformed and armed officers . . . is a relevant factor" here. Majority Op. at 14–15. The factors enumerated in Rogers point to a different conclusion. 556 F.3d at 1137–38. The mere fact that the Officers were uniformed and armed does not negate this consensual encounter when the Officers did not act in any way to threaten Hernandez.

The Officers also maintained a conversational tone throughout the encounter. And Hernandez remained free to walk away, as demonstrated by his having done so *after* the warrant was discovered and Officer Walton parked the patrol car. At the earliest, therefore, Hernandez was only seized once Officer Morghem stepped out of the patrol car

10

and approached him, but by that time there was probable cause for an arrest.

The circumstances surrounding the Officers' encounter with Hernandez were a lesser show of authority than those circumstances the Court held consensual in Drayton, where it reviewed an encounter between three officers and a bus passenger. 536 U.S. at 204. The Court explained: "There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional." Id.

The majority emphasizes that in Drayton the officer testified that if the defendant had wished to leave the bus, he "would have been allowed to do so without argument." Id. at 198. But no facts in Drayton suggest the defendant knew that, and it is hardly the point. To terminate what the Court held was a consensual encounter, Drayton would have been required to stand up, ignore one officer's requests (an officer who had previously leaned over Drayton's shoulder, come within eighteen inches of his face, and reached over him to pat-down and arrest his compatriot), walk down the narrow aisle of the bus, and pass another officer who was positioned at the door. Id. at 198–99.

In contrast, to terminate this encounter, Hernandez need only have ignored the Officers' request and continued walking. The majority seeks to blunt Drayton's force here by claiming that Hernandez "attempted the very act that would have been permitted" in that case, "but he was *asked* to halt." Majority Op. at 18 (emphasis added). But the majority's reliance on the request merely highlights, again, that the majority is eliding the distinction between a *request* and a *command*. See, e.g., Carson, 793 F.2d at 1149. In fact, Drayton itself explicitly distinguishes the coercive force of commands from that of requests. 536 U.S. at 204. And, as the majority cedes, no facts here indicate that

11

Hernandez was commanded to stop. Applying Drayton, as we are required to do, would preclude us from holding that the Officers' non-authoritative request that Hernandez stop walking compelled his compliance.

Finally, the district court explained that Hernandez was questioned "in a public space, but" not "within view of other persons." Aplt. App. at 115. This, that the encounter occurred at night, and the fact that the Officers did not tell Hernandez that he was free to disregard their request appear to be the *only* facts that support the majority's conclusion. See Rogers, 556 F.3d at 1137–38. But in Delgado, the Court emphasized that "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." 466 U.S. at 216.

More specifically, the Court held that none of the factory workers in question were seized during the government's entries upon their workplace. Id. at 220–21. As relevant here, the Court noted that when one of the workers was "[w]alking from one part of the factory to another, [she] *was stopped by* [a government] agent and asked where she was born." Id. at 220 (emphasis added). The Court held that none of the workers were seized. Id. at 221. The majority is mistaken that "a key premise of" Delgado "was that 'when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers.'" Majority Op. at 16 (quoting Delgado, 466 U.S. at 218). Actually, the key premise of Delgado here is what the Court *held*—the consensual encounter between government agents and a factory worker remained so after the worker was *stopped* from *walking* and continuing her *obligations to her employer.* 466 U.S. at 219–21.

12

The Delgado Court determined that despite the presence of numerous agents and the interior setting, the worker who was stopped remained free to ignore the agents to continue her work, and therefore had consented to their inquiries. Id. The Supreme Court's holding that this encounter was consensual undermines the majority's conclusion that Hernandez was seized merely because no one else saw the nighttime encounter on a public street and the Officers did not tell him that he could ignore their request. None of the facts here suggest that a reasonable person in Hernandez's situation would have been so intimidated that he believed he was not free to ignore the request.

Applying these precedents, I would conclude that Hernandez was not seized until after the Officers discovered his outstanding warrant.

### 2. Did Reasonable Suspicion Support this Stop?

Alternatively, even if Hernandez had been seized, that brief seizure was supported by reasonable suspicion that Hernandez was about to commit a crime—he appeared to be casing the construction site.

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Navarette v. California, __ U.S. __, 134 S. Ct. 1683, 1687 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981), and citing Terry v. Ohio, 392 U.S. 1, 21–22 (1968)). An officer may effect such a stop "even though probable cause to arrest is lacking." United States v. Rodriguez, 739 F.3d 481, 485 (10th Cir. 2013) (quoting Terry, 392 U.S. at 22).

Under this "reasonable suspicion" standard, "we ask 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" Id. (quoting Terry, 392

13

U.S. at 20). "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law." Heien v. North Carolina, __ U.S. __, 135 S. Ct. 530, 536 (2014). "The reasonable suspicion analysis does not consider each of an officer's observations in isolation, but rather is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." United States v. Garcia, 751 F.3d 1139, 1143 (10th Cir. 2014) (quotation marks and citation omitted).

We review this question of law de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996). Reasonable suspicion "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Fager, 811 F.3d 381, 386 (10th Cir. 2016) (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). "For reasonable suspicion to exist, an officer must 'articulate something more than an inchoate and unparticularized suspicion or hunch.'" Moore, 795 F.3d at 1229 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). However, "reasonable suspicion must meet only a minimum level of objective justification." Fager, 811 F.3d at 386 (quotation marks and citation omitted).

In the case at hand, the district court reached an erroneous conclusion of law by misapplying precedent and failing to incorporate in its analysis a critical fact that it found: Hernandez's purported inability to recall his grandmother's address. Reasonable suspicion may derive from "'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warrant[] further investigation.'" Sokolow, 490 U.S. at 9–10 (quoting Terry, 392 U.S. at 22). The Supreme Court has held that "innocent behavior will frequently provide the basis for a showing of" reasonable suspicion, so "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree

14

of suspicion that attaches to particular types of noncriminal acts." Id. at 10 (quotation marks and citation omitted). The district court erred by examining each of Hernandez's innocent behaviors in isolation.

Specifically, the district court analyzed those facts piecemeal, determining whether each fact "standing alone" would be "sufficient to confer reasonable suspicion." Aplt. App. at 118. But that mode of analysis is contrary to precedent. United States v. Simpson, 609 F.3d 1140, 1152 (10th Cir. 2010); see Sokolow, 490 U.S. at 9–10. The district court then dismissed each fact as "perfectly innocuous" or, "even" when "combined" together, "simply" unable to "satisfy" the "reasonable suspicion standard," without explaining how its conclusion derived from the aggregate, but limited facts it discussed. Aplt. App. at 118.

Further, the district court failed to consider its own factual finding regarding Hernandez's statement immediately preceding the request to stop. The district court found that Officer Morghem "asked . . . Hernandez where he was coming from and what he was doing, and Hernandez responded that he was coming from his grandmother's house and was 'just trying to go home.' When Morghem asked where his grandmother lived, . . . Hernandez responded that he didn't know the address." Id. at 109. That is, Hernandez failed to identify, even generally, where his grandmother lived. The district court did not account for the legal significance of this fact in its analysis.

Of course, "[b]ecause our analysis depends on the totality of the circumstances, we" must "consider this additional factor here." Moore, 795 F.3d at 1229 n.2. The majority concludes otherwise on the basis that while this fact is cited by the government on appeal, neither the Officers nor the government argued in the district court that it contributed toward reasonable articulable suspicion. But that is irrelevant. The district

15

court made that factual determination, and we have no license to ignore it in conducting our review of the "totality of the circumstances" here. Garcia, 751 F.3d at 1143.

More specifically, as to the Officers, "the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citations omitted) (quoting Whren v. United States, 517 U.S. 806, 814 (1996)). That neither Officer alerted the district court to the significance of one of the facts it later found does not cabin our de novo review of whether all of the facts are sufficient as a matter of law to amount to reasonable suspicion.

As to the government, the majority is of course correct that it bears the burden to prove reasonable articulable suspicion. Simpson, 609 F.3d at 1146. But the majority is incorrect that the government's failure to underscore before the district court the legal significance of an undisputed fact circumscribes our de novo review of this question of law. The government has always maintained that a stop was justified. And the district court found, among other facts which would support reasonable suspicion, that Hernandez stated that he did not know his grandmother's address. The government has presented us with everything necessary to determine the legal significance of this and all other facts that the district court found.

Turning to Hernandez's statement, it was not inconsistent, but a reasonable officer could have found it evasive. In Simpson, we held that "lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion." Id. at 1149. For example, "fairly minor evasions and inconsistencies," such as not knowing one's "mother's telephone number" or not "provid[ing] specifics regarding" topics one

16

broaches all contribute to arousing reasonable suspicion.  Id. at 1150 (citation omitted).

Here, Hernandez was asked where he was coming from and where he was going. He volunteered that he had just come from his grandmother's house, an innocent response.  But when he was asked where she lived, not her exact address, he responded that he did not know the address.  His response was evasive.

Again, the district court fundamentally erred by adopting a piecemeal approach to the facts and disregarding each of them standing alone or for independent insufficiency, thus failing to apply the totality-of-the-circumstances test.  See Garcia, 751 F.3d at 1143; Simpson, 609 F.3d at 1152.  Viewed objectively and in its totality, Hernandez's conduct instead adds up to enough that a reasonable officer would have a valid basis to inquire further, at least enough to ask him to stop and identify himself.  Navarette, 134 S. Ct. at 1687, 1691.  More specifically, Hernandez was walking through a "high-crime area in nighttime darkness."  Fager, 811 F.3d at 389–90 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).  And given the Officers' knowledge of the area, including prior thefts, Hernandez's nighttime presence in the street, walking beside the construction site, clad in all black, and carrying two backpacks supports the Officers' reasonable suspicion.  See Garcia, 751 F.3d at 1143.  Yet even having observed all of this, the Officers did not request that Hernandez stop.  They did so only after he gave an evasive answer.

Rather than taking a divide-and-conquer approach, we must examine together all of the facts of which the Officers were aware when they requested that Hernandez stop and identify himself.  Fager, 811 F.3d at 386.  The Officers located Hernandez (a) at night, (b) wearing all black clothing, (c) and two backpacks, (d) walking in the street instead of on a nearby sidewalk, (e) through an unlit area, (f) in a high-crime location, (g) next to a construction site where they were particularly concerned about thefts, (h) and he

17

purported to have come from his grandmother's house but claimed not to know the address. These facts, taken together, demonstrate that once Hernandez gave his evasive answer, the Officers had an objectively reasonable suspicion that his stated reason for his presence in the area was false and that he was casing the construction site.

At that point, the Officers had reasonable suspicion to request that Hernandez stop walking and identify himself, leading to the discovery of the warrant, and thus probable cause to arrest. Therefore, even if Hernandez's encounter with the police was not consensual, the Officers had reasonable suspicion to briefly stop him and ask his name. I would reverse the district court's order and remand for trial.